KNOLL, Justice.
 

 |, On February 9, 1984, a Tangipahoa Parish grand jury indicted Thomas Sparks
 
 [1]
 
 (“defendant”) for the first-degree murder of Edward Toefield, Jr. On August 18, 1986, a unanimous jury found the defendant guilty as charged. At the penalty phase of the trial, the jury unanimously returned a verdict of death, after finding the following aggravating circumstance: the victim was a peace officer engaged in his lawful duties.
 

 This is a direct appeal under La. Const. art. V, § 5(D) by the defendant. Defendant appeals his conviction and sentence, raising 23 assignments of error. We will address the most significant of these assignments of error in this opinion, and the remaining assignments of error will be addressed in an unpublished appendix. After a thorough review of the law and evidence, we affirm the defendant’s first-degree murder conviction and conditionally affirm the imposition of the death sentence, remanding to the district court for an evidentiary hearing on whether the defendant received effective assistance of counsel at the penalty phase of the trial.
 

 | ¡¿FACTS
 

 These events commenced with a bank robbery in New Orleans, culminating in the tragic death of Deputy Edward Toe-
 
 *449
 
 field, Jr. of the Tangipahoa Parish Sheriffs Office (TPSO) when he attempted to handcuff the defendant.
 

 On February 1, 1984, the defendant, while armed with a pistol, robbed the American Bank and Trust Company of six thousand, nine hundred dollars.
 
 [2]
 
 That night the defendant went to the home of Annie Broadway
 
 [3]
 
 in Hammond. Ms. Broadway and defendant went to a lounge and had drinks, went to an apartment where cocaine was consumed, and spent the night at the Villa Maderne Motel. The next day, February 2, 1984, defendant and Ms. Broadway, after going to the Hammond Square Mall, drove to Amite to see defendant’s grandfather. Defendant, accompanied by Ms. Broadway, then drove back toward Hammond on U.S. Highway 51.
 

 The defendant observed Deputy Toefield driving a marked police vehicle behind him. Defendant pulled over and Deputy Toefield passed very slowly. Defendant then pulled back onto the highway. In Amite, Deputy Toefield pulled over into the curve where the road forks and then pulled back onto the highway behind the defendant. The defendant then pulled into the parking lot of Hi Ho Sam’s.
 
 [4]
 
 He told Ms. Broadway he thought the police officer was on to him and he would probably have to do something because “he wasn’t going to let anybody take him back in.” | .¡Deputy Toefield pulled his car in behind the Oldsmobile defendant was driving, stopping a short distance behind the Oldsmobile, with the driver’s side of the police vehicle closely in alignment with the passenger side of the Oldsmobile. After parking the ear, the defendant and Ms. Broadway separately entered the restaurant.
 

 Shortly before the defendant and Deputy Toefield pulled into the Hi Ho Sam’s, an all points bulletin had been broadcast with regard to the defendant. Deputy Nunzio Camaretta heard Deputy Toefield communicating on his radio at approximately 5:15 p.m., but the transmission was unclear. The last communication from Deputy Toe-field was “stand by.”
 

 Deputy Toefield took the defendant by his left elbow and placed defendant’s hands on the top of the police car. After patting the defendant down, Deputy Toe-field proceeded to handcuff the defendant, beginning by placing the handcuffs on his left wrist. The defendant pulled a gun and shot Deputy Toefield three times, striking him once in the chest and twice in the head.
 

 Two eyewitnesses testified to this shooting: Annie Broadway and Michael Harper. Mr. Harper had just finished his supper at Hi Ho Sam’s. He walked out of the restaurant at the same time as the defendant did. Mr. Harper was looking at Deputy Toe-field because he thought he recognized him as one of his former teachers. According to Mr. Harper, after the first shot Deputy
 
 *450
 
 Toeñeld started to slowly fall. The defendant then shot Deputy Toefield two more times. Deputy Toefield died almost immediately from his wounds. The defendant immediately fled on foot. A manhunt for the defendant ensued.
 

 Late in the afternoon of the following day, February 8, 1984, law enforcement officers with bloodhounds located the defendant in an area with dense forestation, so thick at times the investigators had to get on their hands and knees to get through. |4This was near Natalbany, Louisiana, close to the intersection of Oak Street and Louisiana Highway 1064. Louisiana State Penitentiary Correctional Officer Ronnie Fruge was in the lead with a bloodhound when he noticed movement to his left side and discerned a pistol coming up right towards him. Correctional Officer Bobby Oliveaux saw the defendant pointing a gun at Officer Fruge. Officer Oliveaux fired one round, striking the defendant in the right shoulder. The defendant was immediately arrested.
 

 TPSO Deputy Timothy Oliver discovered a .38 revolver on the ground approximately ten to fifteen feet away from the defendant. Charles Andrews, a forensic scientist with the Louisiana State Police Crime Lab, retrieved the Colt Cobra .38 revolver.
 

 The defendant, who was conscious and ambulatory, was placed into an ambulance and taken to Lallie Kemp State Hospital in Independence, Louisiana. He arrived at the emergency room at 4:45 p.m. The medical examination and treatment were supervised by Dr. Charles Cefalu, then medical director of the hospital. Defendant’s medical chart showed he was assessed as alert, which in medical terms means “top of the scale,” oriented, and “knowing everything that is going on.” The physicians diagnosed the defendant as having a gunshot wound in the right shoulder super-clavicular area resulting in a comminuted fracture to the right clavicle. Dr. Cefalu explained this means the bone was fractured in several splinters. There were multiple bullet fragments in the right axillary region.
 

 In addition to X-rays, a right brachial angiogram was performed. Dr. Cefalu explained that a radiopaque dye is injected into the artery because an X-ray would not correctly illustrate the arteries. The radiologist and surgeons determined there was no arterial damage or evidence of major bleeding.
 

 |sDr. Cefalu explained that nothing was done to the fractured clavicle bone because it is one of the few bones that heals by itself without any reduction or pinning. He testified that a comminuted fracture is less serious than a compound fracture or a displaced fracture. The decision to not remove the bullet fragments was the proper course of medical procedure in this case and was a very common practice. A tetanus shot was administered as well as a broad-spectrum antibiotic. The defendant was released from the hospital at 6 p.m.
 

 The defendant was transported to the Tangipahoa Parish jail. Deputy Roy Al-britton of the TPSO advised defendant of his legal and constitutional rights by reading them to defendant from the “Rights Form.” Deputy Albritton asked defendant if he could read and write to which defendant responded that he could. The defendant then filled in the date and time, his name, age, birthdate and address. The defendant signed the “Rights Form” at 6:13 p.m. on February 3,1984. Lieutenant Brunell Chappel then asked defendant what had happened in the incident.
 

 The defendant stated he was driving on Highway 51 when he noticed the police car following him. The police car passed him and then drove slowly, so he passed the
 
 *451
 
 police car and pulled into the Hi Ho Sam’s parking lot. Defendant stated Deputy Toefield motioned for him to come over to his car, then placed defendant under arrest and advised defendant to place his hands on top of the police car. Deputy Toefield had placed one cuff on defendant’s left hand when defendant pulled a gun from his waist and shot Deputy Toefield three times. Defendant stated he then ran behind the Hi Ho Sam’s and left the area, traveling to Natalbany along the railroad tracks.
 

 The officers then asked defendant if he would give a recorded statement. The defendant refused and said he wanted to talk to a lawyer. At this point all questioning ceased.
 

 IfiAn initial autopsy of the deceased was performed by the Tangipahoa Parish coroner, Dr. Ralph Maxwell. Dr. Maxwell was able to retrieve a large bullet fragment from the decedent’s head. This bullet fragment was marked with an “M” and given to the Tangipahoa Sheriffs Office. At the request of the TPSO, Dr. Maxwell consented to a second autopsy being performed by the New Orleans Coroner’s Office. This autopsy was performed by Dr. Richard Tracy, a pathologist. Dr. Tracy retrieved two bullets: the one that passed through decedent’s heart and the one that entered on the left side of his face.
 

 Patrick Lane, a forensic scientist with the Louisiana State Police Crime Lab was present at the second autopsy. Mr. Lane took possession of the lead bullet fragment that Dr. Tracy removed from Deputy Toe-field’s chest. In his expert opinion, based upon his testing and examination, the lead bullet fragment removed from Deputy Toefield’s chest was fired from the Colt Cobra .38 revolver found near the defendant when he was apprehended. Mr. Lane was unable to identify the bullet Dr. Tracy removed from the decedent’s head as being fired from same revolver. Mr. Lane was able to state that this bullet had the same class characteristics, meaning that it had six lands and grooves with a left hand twist at a ratio of approximately two to one, which all Colt revolvers have and which are commonly referred to by firearms examiners as Colt class characteristics. However, due to its damage, the individualized markings on this bullet were insufficient for Mr. Lane to identify it as coming from the subject revolver.
 

 After a four day trial, the unanimous jury convicted the defendant of first-degree murder. After a penalty phase, the jury unanimously determined the defendant should be sentenced to death.
 

 ^DISCUSSION
 

 Motion to Suppress
 

 (Assignment of error 1)
 

 Defendant avers the trial court erred in denying his motion to suppress his statement, claiming the statement was obtained under circumstances that placed him under the influence of fear and duress sufficient to vitiate voluntariness. Defendant claims that because he was taken to an interrogation room barely ninety minutes after the officer shot him, his statement was coerced. He further avers his blood loss was severe, that he received minimal medical treatment, and he was in pain, therefore any statement he made was involuntary. Additionally, the crowd that gathered at the hospital, whatever its motivation, added a threatening layer of menace.
 

 The trial court held a hearing on the motion to suppress. Deputy Albritton, who informed defendant of his rights, testified the defendant was mentally alert and oriented, and did not complain of pain or appear to be in pain. Deputy Albritton
 
 *452
 
 and Lt. Chappel both testified the defendant understood his rights and was willing to answer questions. Deputy Albritton acknowledged there was a crowd of twenty to thirty people outside of the hospital, but could not say the feeling in the community was running very high concerning the shooting. There was no other evidence or testimony in the hearing concerning the crowd at the hospital.
 

 Dr. Cefalu testified the defendant was medically alert and oriented at the hospital and when he left the hospital. The arteri-ogram was interpreted by the surgeon and radiologist as normal. Defendant was evaluated by the surgeon for major arterial damage. Although in his brief the defendant hypothesizes that his loss of blood was so severe that there was not enough blood for a toxicology screen, Dr. Cefalu’s testimony undermines this supposition. Dr. Cefalu testified other reasons 18existed for the inadequate blood amount. The doctors believed the CBC (complete blood count) and the indicators it measured were of higher priority than a toxicology screen. Four to five tubes of blood were required for all the tests that were run and a toxicology screen required two tubes of blood. Dr. Cefalu theorized the attending physician was told there was insufficient blood collected for a toxicology screen and decided it was unnecessary.
 

 Additionally, Dr. Cefalu stated it was not considered to be an injury that required hospitalization. Defendant in no way indicated he was in pain nor did Dr. Cefalu find him to be in pain.
 

 At the hearing, the defendant testified he did not recall Deputy Albritton reading to him from the “Rights Form.” He also testified the wound to his shoulder hurt a lot and that although he asked for help with the pain, it was refused to him. Defendant stated he knew he had a compound fracture and he knew the bone was coming through the skin. After defendant testified the hearing concluded. The trial court then denied the motion to suppress.
 

 In reviewing the correctness of a trial court’s ruling on a motion to suppress a statement, we are not limited to the evidence adduced at the suppression hearing, but may consider all pertinent evidence adduced at trial.
 
 State v. Leger,
 
 05-0011, p. 10 (La.7/10/06), 986 So.2d 108, 122,
 
 cert. denied,
 
 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007);
 
 State v. Green,
 
 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280. Thus we note that at trial, Dr. Cefalu testified the wound was not actively bleeding when defendant came into the emergency room. The bullet fractured defendant’s clavicle, but there was no major arterial bleeding and no pneumothorax. The fracture needed no casting or pinning and would naturally heal on its own over time. The bone was not protruding through defendant’s skin. Dr. Cefalu testified the ^defendant had a comminuted fracture and not a compound or a displaced fracture.
 

 Before a confession can be introduced in evidence, the State must affirmatively show the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.Rev. Stat. 15:451;
 
 State v. Cousan,
 
 94-2503, p. 5 (La.11/25/96), 684 So.2d 382, 386. For purposes of the Fourteenth Amendment, the test of voluntariness is whether the confession was the product of an essentially free and unconstrained choice by its maker.
 
 Schneckloth v. Bustamonte,
 
 412 U.S. 218, 225-226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Voluntariness is assessed on a case by case basis under a totality of the circumstances standard.
 
 Schneckloth,
 
 412 U.S. at 226, 93 S.Ct. at 2047;
 
 State v. Manning,
 
 03-1982, p. 26 (La.10/19/04), 885 So.2d 1044, 1075,
 
 cert.
 
 
 *453
 

 denied,
 
 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). The trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of a confession are accorded great weight and will not be disturbed unless clearly unsupported by the evidence.
 
 State v. Hunt,
 
 09-1589, p. 11 (12/1/09), 25 So.3d 746, 754;
 
 Cousan,
 
 94-2508, p. 5, 684 So.2d at 386.
 

 In his brief, defendant avers the authorities denied him reasonable medical care and left him in pain. He also contends the behavior of the crowd outside the hospital added a threatening layer of menace. The defendant claims his situation was analogous to situations in which the United States Supreme Court has ordered confessions suppressed, citing
 
 Mincey v. Arizona,
 
 437 U.S. 385, 398-401, 98 S.Ct. 2408, 2416-2418, 57 L.Ed.2d 290 (1978) (statements of a defendant who had been shot in the hip a few hours earlier, obtained by interrogation in the intensive care unit while seriously and painfully wounded and on the edge of consciousness held not to be product of a rational intellect and free will);
 
 Beecher v. Alabama,
 
 389 U.S. 35, 36-38, 88 S.Ct. 189, 190-191, 19 L.Ed.2d 35 (1967) (defendant, captured when shot in leg, threatened at that time by law enforcement he would be killed and a rifle feed next to his ear, then questioned in prison hospital after receiving morphine for his pain led to the inescapable conclusion the confessions were involuntary);
 
 Payne v. Arkansas,
 
 356 U.S. 560, 567, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958) (obvious from the totality of the course of conduct, particularly the culminating threat of mob violence, where the police chief told the defendant if he would tell the truth, the chief would probably keep the 30 or 40 people from coming in, that the confession was coerced). On this record before us, we find the defendant’s situation was in no way analogous to these cases.
 

 Mincey was in intensive care, with a tube in his throat to help him breathe, a tube through his nose into his stomach to keep him from vomiting, and in and out of consciousness during the interrogation.
 
 Mincey,
 
 437 U.S. at 396-400, 98 S.Ct. at 2415-2418. When captured and asked if he had committed the crime, Beecher responded he had not. The police chief, holding a loaded gun to Beecher’s face, said he would kill Beecher if he did not tell the truth and another officer, who was pointing a rifle at the side of Beecher’s head, fired the rifle next to Beecher’s ear.
 
 Beecher,
 
 389 U.S. at 36, 88 S.Ct. at 190. Later at the prison hospital, with his leg so swollen and painful he required morphine, he was interrogated.
 
 Id.
 
 The medical assistant told Beecher to cooperate and in Beecher’s presence, asked the investigators to inform him if Beecher did not tell them what they wanted to know.
 
 Id.
 
 In this matter before us, all testimony other than the defendant’s declared the defendant was mentally alert and oriented, did not appear to be in pain, and did not complain of pain. The physicians evaluated and treated the defendant’s injuries. There was no evidence to contradict their medical judgment the defendant did not require hospitalization or | nthat their medical treatment was improper. The defendant was informed of his rights and signed the Rights Form declaring he had read and understood his rights. In short, there is nothing analogous between the defendant’s interrogation and those at issue in
 
 Mincey
 
 and
 
 Beecher.
 

 Nor was the situation comparable to the one in
 
 Payne v. Arkansas.
 
 There the police chief told Payne that 30 or 40 people were outside that wanted to get him, and that if Payne would tell the truth, he would “probably keep them from coming in.”
 
 Payne,
 
 356 U.S. at 564, 78 S.Ct. at 848. Contrary to defendant’s assertion in his
 
 *454
 
 brief that the crowd gathered at the hospital “threatened to come into the emergency room” there is absolutely no evidence in the record to support this assertion. Nor is there any evidence the crowd added a threatening layer of menace.
 

 Under the totality of the circumstances, we find the trial court’s ruling on the admissibility of the statement is supported by the evidence. Defendant has failed to show he did not make a knowing and intelligent waiver or that he was under the influence of fear and duress sufficient to vitiate voluntariness. This assignment of error is without merit.
 

 Right to Fair Trial by Impartial Jury
 

 (Assignment of error 6)
 

 In his sixth assignment of error, defendant avers he was denied his constitutionally guaranteed right to a fair trial by impartial jurors, due to pervasive publicity of the offense and its aftermath. This assignment of error consists of three arguments: (1) the trial court erred when it denied defendant’s second motion for a change in venue; (2) the trial court erred in denying three defense challenges for cause; and (3) the trial court seated a biased petit jury. We address each in turn.
 

 Motion for Change of Venue
 

 Defendant contends “inflammatory media coverage” of the shooting of Deputy |12Toefield and of the manhunt for defendant pervaded Livingston Parish. He argues additionally that invidious publicity concerning his Muslim faith and his perceived dangerousness “swirled around the community and the courthouse.” Considering the extraordinary media coverage, the pervasive pre-trial publicity and the unprecedented and extraordinary security never before seen at the Livingston Parish courthouse, defendant avers the trial court erred in not granting his second motion for a change in venue.
 
 [5]
 

 On July 28, 1986, at the hearing on the second motion for change in venue, the following testimony and evidence was introduced. Mr. Phillip Womack, a reporter for the Denham Springs Livingston Parish News, testified he wrote an article that appeared in the July 28,1986 edition of the paper. The article, which was introduced into evidence, reported that defendant was “currently serving a 99-year sentence in Louisiana State Penitentiary” for a bank robbery conviction in Orleans Parish. It was also reported that at the time Deputy Toefield was killed, defendant was being sought by St. Landry Parish authorities in connection with the rape of a 13-year-old girl that occurred a week before, that defendant had been released from prison in April 1983 after serving twelve years on an armed robbery conviction, and, most recently, defendant and two other inmates were “implicated in an allegedly planned escape at the Livingston Parish Prison....” Mr. Womack testified that the article was basically a factual review of the case, did not express an opinion on the guilt or innocence of the defendant, and that the paper had run possibly five or six articles about the crime in the preceding two-year period.
 

 In addition, seven prospective jurors were randomly called and questioned. Mr. Joseph Aime stated he had not heard or read anything about the case and had not |,seven heard of the defendant. Ms. Virginia Blackledge declared she had read the article that day and conceded that the article was a factual representation which did not state an opinion. She also stated she had not formed an opinion about the
 
 *455
 
 defendant’s guilt or innocence. In addition, she testified that everyone in the jury pool was reading the Denham Springs Livingston Parish News. Mr. James Cobb recalled newspaper accounts about the crime at the time it occurred, but he did not read the article published in the July 28, 1986 edition of the paper. Nor did he see any other prospective jurors reading that newspaper. He had not formed an opinion about whether the defendant was guilty.
 

 Mr. Milton Core, Jr., testified he had heard of the case, possibly from television, and might have “glanced” at newspaper articles. He had not seen that day’s edition of the Denham Springs Livingston Parish News and had not seen people in the lobby reading the paper. He stated he did not know enough about the case to form an opinion. Mr. James Phillips believed he had read something about the case in the Hammond Daily Star about three months ago. He did not read the article admitted into evidence, did not know anything about the case and had not paid much attention to the case. Mr. Joseph Haskins read and recalled details from the newspaper article published that day and also recalled seeing something on television possibly one year earlier. Mr. Haskins stated the article did not contain any quotes from any officials in the 21st Judicial District. Although he stated he thought the defendant was guilty if he had done what was reported in the newspaper, he agreed that he could put the article out of his mind and follow the law given by the judge.
 

 The final prospective juror called, Mr. Harris Reams, Jr., had not read or heard anything about the case until he read the article about fifteen minutes before he took the stand. Mr. Reams stated the article did not contain any quotes from the district 114attorney or from that office. He also stated the article had not caused him to form an opinion as to the defendant’s guilt or innocence and he did not know if the article was true. At the conclusion of the hearing the trial judge denied the motion for a change of venue.
 

 In his appellate brief, defendant also argues the trial took place against a backdrop of unprecedented and extraordinary security which contributed to a “virtual carnival atmosphere.” Defendant contends the presence of armed officers, some with automatic weapons, on the roof of the courthouse and on the streets leading to the courthouse contributed to a reinforcement of community prejudices by government officials while interjecting a marked note of fear. Relevant to these arguments made on appeal is the motion to quash filed by the defendant, alleging that extreme security measures denied him a fair trial and a presumption of innocence. At the hearing on the motion, held on August 11, 1986, Deputy David Cobb with the Livingston Parish Sheriffs Office testified he was armed with an automatic weapon and in plain view of people coming to the courthouse. He was with the group that had transported the defendant to the courthouse and there were other officers with automatic weapons in view. He further testified that he was out there about forty-five minutes and departed well over an hour before court started at 9:30 a.m.
 

 Chief Criminal Deputy Willie Graves of the Sheriffs Office also testified. He stated law enforcement officers were on the roof armed with single-shot rifles, possibly visible to the public. He testified that the metal detectors and extra security, which to his knowledge had not occurred in any prior trial, were necessary based upon the defendant’s prior records, the current charge, and certain remarks that had been made as to things that might take place.
 
 [6]
 

 
 *456
 
 [ 1sThe warden of the Livingston Parish Prison, Mr. Abe Ross, also testified. He took the extraordinary security measures, including having officers on the courthouse roof with rifles, because he had learned through two informants that the defendant and three other inmates had formulated an escape plan. A “shank” was found in the cell of one of the inmates planning to escape. The remainder of the hearing consisted of counsels’ arguments. In denying the motion, the trial judge stated there was no evidence presented to show an oppressive atmosphere. We now must decide whether this record supports the defendant’s argument that the trial court erred in finding the defendant failed to show actual prejudice necessitating a change in venue.
 

 A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. I, § 16;
 
 State v. Lee,
 
 05-2098, p. 32 (La.1/16/08), 976 So.2d 109, 132,
 
 cert. denied,
 
 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008). Concurrent with this right, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial.
 
 Lee,
 
 976 So.2d at 132;
 
 State v. Weary,
 
 03-3067, p. 27 (4/24/06), 931 So.2d 297, 316,
 
 cert. denied,
 
 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006). Changes of venue are governed by La. Code CRiM. Proc. art. 622 (West 1986, West 2010), which provides:
 

 A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
 

 In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
 

 In unusual circumstances, prejudice against the defendant may be presumed. J^Proceedings entirely lacking in the solemnity and sobriety to which a defendant is entitled, but instead utterly corrupted by press coverage and/or conducted in a carnival-like or inflammatory atmosphere, are presumptively prejudicial.
 
 Murphy v. Florida,
 
 421 U.S. 794, 798-799, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975);
 
 Sheppard v. Maxwell,
 
 384 U.S. 333, 355-356, 86 S.Ct. 1507, 1518-1519, 16 L.Ed.2d 600 (1966);
 
 State v. David,
 
 425 So.2d 1241, 1246 (La.1983). The circumstances here did not reach the level where prejudice is presumed. The courtroom atmosphere was not carnival-like and the background was not infected by extremely inflammatory press coverage.
 
 Sheppard,
 
 384 U.S. at 353-356, 86 S.Ct. at 1517-1519 (press coverage was massive and pervasive, including the unprecedented erection of a press table inside the bar, and a courthouse given over to accommodate the public appetite for the bizarre);
 
 Estes v. Texas,
 
 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (trial conducted in a circus atmosphere due in large part to intrusiveness of press where some proceedings were telecast live and a special booth was constructed in the courtroom for filming).
 

 
 *457
 
 A defendant must prove more than mere public general knowledge or familiarity with the facts of the case to be entitled to a change of venue.
 
 Lee,
 
 976 So.2d at 133;
 
 State v. Frank,
 
 99-0553, p. 14 (La.1/17/01), 803 So.2d 1,15. Extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair.
 
 Dobbert v. Florida,
 
 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). The defendant bears the burden of showing that there exists such prejudice in the collective mind of the community that a fair trial is impossible.
 
 State v. Clark,
 
 02-1463, p. 17 (La.6/27/03), 851 So.2d 1055,
 
 1070, cert. denied,
 
 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004);
 
 State v. Vaccaro,
 
 411 So.2d 415, 424 (La.1982). Whether a defendant has 117made the requisite showing of actual prejudice is a question addressed to the trial court’s sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion.
 
 Lee,
 
 976 So.2d at 133;
 
 Clark,
 
 851 So.2d at 1071.
 

 In
 
 State v. Bell,
 
 315 So.2d 307, 311 (La.1975), we enumerated some relevant factors in determining whether to change venue. Those factors are: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
 
 Id.
 
 In determining whether to change venue, the focus must extend beyond the prejudices and attitudes of the individual venirepersons, and the defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the jurors’ answers during voir dire, or the witnesses’ testimony, or that for any other reason a fair and impartial trial could not be obtained in that venue.
 
 Clark,
 
 851 So.2d at 1070;
 
 Bell,
 
 315 So.2d at 313.
 

 In reviewing a denial of a change in venue, courts primarily inquire as to the scope and nature of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial, in order to ascertain whether prejudice existed in the mind of the public which prevented the defendant from receiving a fair trial.
 
 Clark,
 
 851 So.2d at 1071;
 
 see, e.g., Murphy v. Florida,
 
 421 U.S. at 802-803, 95 S.Ct. at 2037. The seven factors enumerated in
 
 Bell
 
 help facilitate this inquiry into the nature and scope of publicity disseminated in the community where a crime occurred.
 
 Clark,
 
 851 So.2d at 1071. However, courts must distinguish between mere familiarity with the defendant or his past and an actual predisposition against him.
 
 Murphy v. Florida,
 
 421 U.S. at 800, n. 4, 95 S.Ct. at 2036. Bearing these precepts in mind, we examine the relevant
 
 Bell
 
 factors in order to determine whether the trial court erred or abused it discretion in denying the defendant’s second motion for a change of venue.
 

 Nature and degree of pre-trial publicity:
 
 We first observe that, in contrast to the plethora of media evidence admitted at the hearing of the first motion for a change of venue, the only media
 
 *458
 
 evidence admitted at the hearing on the second motion for a change of venue was an article from the July 28, 1986 edition of the Denham Springs Livingston Parish News. Our review of this article, as summarized above, shows it to be largely factual and not invidious or inflammatory.
 
 See, Murphy v. Florida,
 
 421 U.S. at 800, n. 4, 95 S.Ct. at 2036 (On review of a denial in change of venue, courts must distinguish between largely factual publicity from that which is invidious or inflammatory.)
 

 Additionally, our opinion in
 
 State v. Lee, supra,
 
 is instructive. In that highly publicized and notorious case, 128 of 125 potential jurors (98.4%) testified that they were at least vaguely familiar with the case through media accounts or informal private conversations.
 
 Lee,
 
 976 So.2d at 133. The trial judge excused 40 jurors (32%) for cause due to their exposure to publicity or opinions about the case.
 
 Id.
 
 Lee challenged 16 jurors for cause, which, if all had been granted, the total percentage of cause challenges would have been 44%. The number of jurors excused for cause for having a fixed opinion is another gauge of whether prejudice exists in the public |19mind.
 
 Id.; Clark,
 
 851 So.2d at 1071. In this matter
 
 sub judice,
 
 the trial court had to excuse far less than thirty percent (30%) of the jurors questioned during voir dire on the grounds of a fixed opinion on the defendant’s guilt. The court excused 11 of 88 (12.5%) potential jurors for cause due to a fixed opinion. Additionally, the defendant challenged three jurors for cause which the trial court did not grant. Accordingly, if the court had granted all of these challenges, the total percentage of cause challenges would have been 15%.
 
 See Murphy v. Florida,
 
 421 U.S. at 803, 95 S.Ct. at 2037-2038 (that 20 of 78 venire-persons were excused because of their opinion about defendant’s guilt [26%] “may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.”);
 
 compare Irvin v. Dowd,
 
 366 U.S. 717, 727, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961) (when 268 of 430 venirepersons [62%] were excused for cause due to a fixed opinion, impartial jurors were hard to find).
 

 These percentages indicate that a fair trial was possible in Livingston Parish. Moreover, all the jurors who served assured the court they understood the presumption of innocence, and would be able to decide the case based solely upon the evidence presented at trial and follow the judge’s charges on the law.
 

 Connection of government officials with publicity:
 
 In
 
 Bell,
 
 this Court noted, in overruling the trial judge’s refusal to grant a change of venue, that “government officials had commented publicly at the time of the riot that they were satisfied the defendants were guilty of the crime charged, should be severely punished and that the citizenry was ready and waiting should other black [Mjuslims come to Baton Rouge.”
 
 Id.,
 
 315 So.2d at 311. The single article introduced and admitted into evidence at the hearing on the second motion for change in venue does not demonstrate inflammatory [gnor invidious comments by government officials. Nor is there any evidence in this record of any government official providing opinion commentary. The extent of official comments in the July 28, 1986 Denham Springs Livingston Parish News article were restricted to factual background.
 

 Length of time between publicity and the trial:
 
 More than two years had elapsed between the flurry of media accounts following the murder and arrest of the defendant and the trial in neighboring Livingston Parish. There is little in the
 
 *459
 
 record to suggest the publicity of the offense remained at as high of a level as it originally was at the time of its commission. In short, the record of publicity preceding the trial does not demonstrate the “barrage of inflammatory publicity immediately prior to trial,”
 
 Murphy v. Florida,
 
 421 U.S. at 798, 95 S.Ct. at 2085, amounting to a “huge ... wave of public passion,” found in
 
 Irvin v. Dowd,
 
 366 U.S. at 728, 81 S.Ct. at 1645.
 
 Patton v. Yount,
 
 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984).
 

 Severity and notoriety of the offense:
 
 Although the severity and notoriety of the murder of Deputy Toefield was extreme, the severity of the crime does not extend beyond the pale of other first-degree murder convictions this Court has reviewed. By their nature, such crimes are almost by definition heinous and grave, but the facts surrounding the murder of Deputy Toefield are not uncommon when compared with other similar first-degree murder convictions upheld on appeal.
 
 See e.g., State v. Williams,
 
 07-1407, pp. 1-2 (La.10/20/09), 22 So.3d 867, 872 (defendant murdered off-duty police officer working security detail),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 3278, 176 L.Ed.2d 1184 (2010);
 
 State v. Frank,
 
 99-0553, p. 2 (La.5/22/07) 957 So.2d 724, 728 (defendant robbed restaurant where off-duty police officer and others were killed);
 
 State v. Brumfield,
 
 96-2667, p. 19 (La.10/20/98), 737 So.2d 660, 671 (defendant shot and killed off-duty police officer escorting a store manager on way |aito make bank deposit),
 
 cert. denied,
 
 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999);
 
 State v. Prejean,
 
 379 So.2d 240, 249 (La.1979) (defendant shot and killed officer conducting a traffic stop),
 
 cert. denied,
 
 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980).
 

 The area from which the jury was drawn:
 
 Although Livingston Parish is rural and adjacent to Tangipahoa Parish, it is still somewhat removed. Moreover, the jury pool was drawn primarily, if not exclusively, from the western area of the parish; the border it shares with Tangipa-hoa Parish is on its eastern edge. Although 57% of potential jurors had heard something about the case, only 12.5% were removed for forming a firm opinion of the defendant’s guilt. Moreover, no potential jurors that knew any of the parties or witnesses were allowed to remain, nor were any who were related to anyone in law enforcement allowed to remain. With a venire pool so relatively large, however, this did not cause a dearth of qualified prospective jurors.
 

 Other community events that either affect or reflect the community attitude or individual jurors toward the defendant:
 
 There was increased security precautions during the defendant’s trial that could have partially affected the community’s attitude toward the defendant. However, with minimal exceptions,
 
 [7]
 
 the venireper-sons did not testify that their lives had been in any way disrupted by the defendant, the manhunt for him, or by the incidents of his trial. Other than the sole news article and the questioning of seven prospective jurors, none of which demonstrated an inability to obtain an impartial jury and a fair trial, there was no evidence presented to demonstrate other events in the community necessitating a change in venue.
 

 
 *460
 

 Any factors likely to affect the candor and veracity of the prospective jurors:
 
 E/The defendant contends the lengthy questioning and the extent to which the State and trial court went to rehabilitate some jurors evinces some jurors may have felt pressured to give answers that minimized their partiality. However, defendant points to nothing in the record to support this argument. Our review of the record shows that any rehabilitation of potential jurors was nothing out of the ordinary. Defendant avers because of the police presence, jurors may have felt pressured to give answers that minimized their partiality. The defendant points to nothing in the colloquies that indicates prospective jurors were anything less than forthcoming in their answers or felt pressure from the police presence.
 
 Cf. Holbrook v. Flynn,
 
 475 U.S. 560, 571, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986) (presence of uniformed, armed state troopers seated in spectator section of courtroom did not prejudice defendant and violate his right to due process).
 

 In sum, considering that far less than one-fifth of the prospective jurors were excused because of their inability to put aside their pre-trial exposure, the defendant fails to demonstrate in the context of the other
 
 Bell
 
 factors that the doubtlessly high press coverage of the manhunt and prosecution was sufficient to alter the “candor and veracity” of the juror’s answers on voir dire. In fact, several jurors expressed their lack of enthusiasm for serving on the jury, despite their willingness to do so if called upon. As this Court has previously observed, “the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is insufficient to rebut the presumption of the juror’s impartiality.”
 
 Clark,
 
 02-1463, p. 19, 851 So.2d at 1071. The defendant fails to show the existence of pretrial publicity was such that it would color the jurors’ voir dire responses to the point of making them unreliable and that he was therefore deprived of his right to trial by a fair and impartial jury.
 

 |
 
 ¾⅞Defense Challenges for Cause
 

 Next, we turn to defendant’s averment that three challenges for cause were improperly denied. Louisiana Code Criminal Procedure art. 797 (West 1986, West 2010) provides, in relevant part:
 

 The state or the defendant may challenge a juror for cause on the ground that:
 

 [[Image here]]
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or an impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
 

 [[Image here]]
 

 (4) The juror will not accept the law as given to him by the court; or
 

 [[Image here]]
 

 Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges.
 
 State v. Blank,
 
 04-0204, p. 25 (La.4/11/07), 955 So.2d 90, 113,
 
 cert. denied,
 
 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007);
 
 State v. Lindsey,
 
 06-0255, p. 2 (La.1/17/07), 948 So.2d 105, 107;
 
 State v. Robertson,
 
 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280. A defendant must use one of his peremptory challenges curatively to remove the juror, thus reducing his remaining peremptory challenges, or waive any complaint on appeal.
 
 Blank,
 
 955 So.2d at 113. An erroneous ruling depriv
 
 *461
 
 ing a defendant of a peremptory challenge substantially violates that defendant’s rights and constitutes reversible error.
 
 Blank,
 
 955 So.2d at 114;
 
 Lindsey,
 
 948 So.2d at 107. In the matter
 
 sub judice,
 
 the defendant exhausted all of his peremptory challenges
 
 [8]
 
 and therefore his objection to the rulings refusing to sustain his challenges for cause is properly before us.
 

 | j>4The defendant contends the trial court erred in denying his challenge for cause to three prospective jurors; he maintains all three were biased. When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted.
 
 Lindsey,
 
 948 So.2d at 107-108. Yet, if after subsequent questioning, or rehabilitation, the juror exhibits the ability to disregard previous views and make a decision on the evidence presented at trial, the challenge is properly denied.
 
 Id.,
 
 at 108. When addressing whether a challenge for cause should be granted, the trial judge must look at the juror’s responses during his or her entire testimony, not just isolated answers.
 
 Id.
 

 A trial court has broad discretion in ruling on a challenge for cause, and the determination will not be disturbed unless a review of the entire voir dire indicates an abuse of discretion.
 
 State v. Campbell,
 
 06-0286, p. 73 (La.5/21/08), 983 So.2d 810, 858,
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008);
 
 Lindsey,
 
 948 So.2d at 108. A prospective juror’s seemingly prejudicial response is not grounds for an automatic challenge for cause. A trial judge’s refusal to excuse the juror on the grounds of impartiality is not an abuse of discretion if, after further questioning, the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence.
 
 Lindsey,
 
 948 So.2d at 108;
 
 State v. Leger,
 
 05-0011, p. 77 (La.7/10/06), 936 So.2d 108, 162. However, a challenge for cause should be granted even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render a judgment according to the law may be reasonably implied.
 
 Lindsey,
 
 948 So.2d at 108.
 

 Juror disqualification questions raise both a question of law — whether the correct standard was applied — and a question of fact — whether an opinion | ^expressed by a juror was such to meet the legal standard for disqualification.
 
 Patton v. Yount,
 
 467 U.S. at 1037, n. 12, 104 S.Ct. at 2891. The constitutional standard that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court is a question of federal law.
 
 Id.
 
 Deference is due to the trial court’s factual determination of whether the juror should be disqualified.
 
 Id.
 
 The determination is essentially one of credibility, and therefore largely one of demeanor.
 
 Id.,
 
 467 U.S. at 1038, 104 S.Ct. at 2892. The manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words; this is evident before the trial court but cannot always be spread upon the record.
 
 Id.,
 
 467 U.S. at 1037, n. 12, 104 S.Ct. at 2891.
 

 1. Linda Gonzales: Defendant twice challenged Ms. Gonzales for cause; he avers the trial court’s rejection of the challenge was error. Ms. Gonzales testified she had read about the case in the newspaper, but also stated she knew not
 
 *462
 
 everything reported was always accurate. She stated she understood the presumption of innocence. In response to State questioning as to whether she could lay aside her opinion in this case and accept that the defendant was innocent until proven guilty and render a verdict based on the evidence presented in court, Ms. Gonzales answered she did not know if she could with her “already pre-formed opinion” but she could try. The State asked her what difficulty would she have in affording the defendant the right she would want to have. Her response was it would be difficult to set aside her emotions; it was hard for her to understand how somebody could do the things he was supposed to have done. She felt it was just inhuman. In response to the State’s question, she answered she would not be able to use the newspaper accounts in determining the defendant’s guilt or innocence. The voir dire of Ms. Gonzales continued as follows:
 

 12f,Q. [By the State] So with regard to this particular man sitting here you really don’t have an opinion as to his guilt or innocence do you?
 

 A. No, sir.
 

 Q. Because you don’t know him.
 

 A. No, sir.
 

 Q. Have you ever seen him before?
 

 A. No.
 

 Q. So, you haven’t formed an opinion as to the guilt or innocence of this man who is sitting right here?
 

 [[Image here]]
 

 A. I have no opinion on him, no, sir.
 

 Q. Do you believe that you could give him as fair a trial as you yourself would want to have from the viewpoint of a juror if you were selected to serve on this jury?
 

 A. I could try.
 

 Q. Ma’am?
 

 A. I could try.
 

 Q. You would give it your very best, is that correct?
 

 A. Yes, sir.
 

 [[Image here]]
 

 Q. [By defense counsel] I appreciate your candor and straightforwardness in this case. When you first took the stand and [the State] was questioning you, you indicated that you already knew something or some things about this case, is that correct?
 

 A. Yes, sir.
 

 Q. And you further indicated that from that you had already formed an opinion, is that correct?
 

 A. Yes, sir.
 

 Q. And despite what I get here and say in verbal gymnastics or what Mr. Quin may say in verbal or communicative gymnastics, the fact is, you have already got an opinion, is that true?
 

 | j,7A. More or less, yes, sir.
 

 At this point, the defense challenged Ms. Gonzales for cause. After it was denied, he continued questioning Ms. Gonzales.
 

 Q. Do you recall what the Denham Springs News or what any papers you read may have said about this case or about Mr. Sparks?
 

 A. It just accounted to the fact that he had assaulted an officer and shot him, had shot an officer and then later raped a young girl. That is in general what it said.
 

 Q. And even though this case has nothing to do with rape, is there any way in the world you could put that out of your mind?
 

 A. Like I said before, I could try.
 

 Q. Can you approach this case impartially?
 

 A. I can try.
 

 Q. Despite what you have read?
 

 
 *463
 
 A. I can try. That is the best I can do.
 

 Again the defendant challenged for cause, which the court denied.
 

 We find Ms. Gonzales’s answers indicated that she understood the presumption of innocence, the State’s burden of proof, and the requirement that determination of guilt or innocence was only to be made based upon evidence at trial and not information from newspapers. We do not find an abuse of the trial court’s discretion in determining Ms. Gonzales demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Ms. Gonzales’s responses, as a whole, do not reasonably imply bias or prejudice.
 

 2. Tammy Carrier: Ms. Carrier had only found out about the case at the beginning of voir dire. She had not expressed an opinion to anyone about the guilt or innocence of the defendant. She only faintly recalled news accounts about the murder at the time it occurred. In response to State questioning, she stated she [^understood the State’s burden of proof and that the defendant was presumed innocent.
 

 In response to questioning by the defense as to what she had heard or read, Ms. Carrier stated:
 

 This is what I have heard. I have heard that the defendant had supposedly committed armed robbery and raped a small child and for some reason had a 99 year sentence and that he is being transported from New Orleans to Tangipahoa when this thing that he is accused of happened and that a deputy was killed and that I heard that he was a Moslem priest. I don’t know if these are just rumors or what, but it is just what I have heard and I heard that he was a Moslem priest and the company that I work for conducts surveillance at the parish prison and said that security was real tight and there could be some type of trouble during the course of the proceedings and security was tight and that is all I have heard about it.
 

 She also stated she heard some “followers” might cause trouble and this made her apprehensive to be a juror. When asked by the defense whether this other information would influence her decision in this case, Ms. Carrier stated “as a juror I would just have to consider evidence.” Ms. Carrier, who had a degree in accounting from LSU, stated she had studied a little contract law and understood the nature of evidence. She further replied she would have to consider the evidence that was admitted, which “would take the weight,” and she thought she could put all the other information totally out of her mind. She qualified this by stating she was sick and presenting a doctor’s note for acute nasal pharyngytis. She explained this was a viral inflammation of the throat.
 

 The defense challenged her for cause based upon her prior knowledge, which was denied. While we do not ignore Ms. Carrier’s somewhat troubling statements about the defendant’s religion and fear of “followers,” she also very clearly stated that she was to consider and weigh only the evidence presented, not “hearsay” as she called it. Again, considering that the trial judge was in the position to determine credibility, in which demeanor plays an important role, and taking into account Ms. Carrier’s ability to disregard previous views and make a determination upon the | ggevidence presented at trial, we find no error' in the trial court’s denial of the challenge for cause.
 

 3. Mary Matherne: Although initially Ms. Matherne was unclear about the State’s burden of proof, after it was explained she indicated she understood. She understood that a man is presumed
 
 *464
 
 innocent until proven guilty beyond a reasonable doubt, but when asked if she could “accept the fact that as he sits here right now” defendant is presumed innocent, she said no. She felt “what he did was wrong ... [u]ntil he is proven, you know, he has to prove he is [not] guilty.” She had read “a little bit” about the ease, but conceded she did not necessarily know it was the defendant who did something bad nor would she automatically convict him just because the crime occurred. She agreed she would require the State to prove the defendant committed the crime. When asked what the death penalty meant to her, Ms. Matherne stated “I feel he deserves, you know, he gets what is coming to him because that sheriff didn’t — .” She did consider the death penalty extreme. When asked whether she thought human life was precious to the defendant she answered in the negative. After objection by the defendant, this last question was withdrawn.
 

 When questioned by the defense as to whether her mind was made up that the defendant was guilty, Ms. Matherne said yes. The defense asked if there was anything that anybody could say or do to changer her mind and she answered no. Defendant then challenged Ms. Matherne.
 

 The court then spoke with Ms. Math-erne concerning her conflicting answers. After again explaining the State’s burden of proof, the defendant’s presumption of innocence, and that she would have to limit her opinion to the evidence presented in court, Ms. Matherne agreed she fit the requirements to sit on the jury. She further answered she would be comfortable with someone like her judging guilt or innocence |Rnif she was a defendant. She also agreed she could apply the reasonable doubt standard and if the question were close she would decide in the defendant’s favor. We believe the following colloquy between the court and Ms. Matherne pertinent:
 

 Q. Could you hold the State to the burden of proof that is required by law and which I’ll charge you that they have to prove every element of the offense charged, every element, beyond a reasonable doubt; could you do that and if they fail to do it, could you find him not guilty?
 

 A. No, sir.
 

 Q. It was a compound question. Okay. Let’s start over. Could you hold the State to the burden of proof that I charge you that they are responsible for?
 

 A. Yes, sir.
 

 Q. If they fail to do that, can you find him not guilty?
 

 A. No, sir.
 

 Q. Explain that answer. I am not sure I understood.
 

 A. Explain to me over again—
 

 Q. If the State fails to prove that Mr. Sparks is guilty of the crime charged, what would your verdict be?
 

 A. Not guilty.
 

 Q. And you could do that?
 

 A. Yes, sir.
 

 [[Image here]]
 

 Q. Now, when somebody asked you, have you read about this case your answer is yes, I have. Is that true?
 

 A. Yes, sir.
 

 Q. Are you going to allow what you read to influence your decision in this courtroom if you are selected as a juror?
 

 A. Yes, sir.
 

 Q. How would it effect [sic] you?
 

 131 A. I am so nervous. I just don’t know. I just can’t think right now. My mind is blank.
 

 
 *465
 
 Q. Let me ask that question again. I am going to ask that last question one more time. Would you be influenced if you were selected as a juror, would your decision be influenced by what you read in the newspaper?
 

 A. No.
 

 Q. Okay. You are telling me—
 

 A. I really can’t remember too much of what I have read honestly. Like I said, I don’t read the paper that much, I really don’t have much time when I do pick it up.
 

 Q. If there was evidence presented in court that was contradictory to something you read in the newspaper, which would you believe?
 

 A. I wouldn’t believe the newspaper because you can’t believe too much of what, you know, they print because they do twist turn things around a lot.
 

 Q. So, you wouldn’t have a problem if there was some contradictory evidence presented?
 

 A. No, sir.
 

 The court then asked if there were further questions. The defense asked as follows:
 

 Q. If the judge would instruct you that you would have to put all of that out of your mind and judge this case strictly from the witness stand, then what is your opinion now as to the guilt or innocence of this man?
 

 A. Guilty.
 

 The trial judge asked that the question be explained to him. The defense stated: “If she had to judge the case strictly from what was presented as evidence from the witness stand, based on the principles which you explained to her, what would her decision be right now?” The court stated the question was “impossible” to answer. The defense renewed its challenge for cause, which was denied as Ms. Matherne “admitted she has read about the case” and that was not a problem.
 

 In this appeal, defendant contends the trial court erred because Ms. Matherne’s knowledge had spawned a belief in the defendant’s guilt. Defendant relies upon
 
 State
 
 v.
 
 Smith,
 
 491 So.2d 641, 646 (La.1986) (where juror made no declaration that she could lay aside her opinion as to Smith’s guilt, trial court could not have been reasonably satisfied she could render an impartial verdict);
 
 State v. Guillory,
 
 146 La. 434, 83 So. 754, 755 (1920) (trial court erred in denying challenge for cause where juror declared the defendant would have to have enough evidence “to offset what I heard”).
 

 We find defendant’s reliance on this jurisprudence is misplaced. In
 
 Smith,
 
 this Court found the trial court manifestly erred in failing to grant the challenge for cause where the prospective juror was “never asked to declare whether she could lay aside her opinion or impression” of defendant’s guilt and render a verdict based on the evidence presented in court.
 
 Id.,
 
 at 646. In this matter before us, Ms. Matherne was questioned as to whether she would be influenced by the news accounts she had read and she answered she would not. She also declared she would find the defendant not guilty if the State failed to meet its burden of proof. She demonstrated that she could lay aside her opinion and render an impartial verdict according to the law and evidence. This distinguishes Ms. Matherne from the jurors at issue in
 
 Smith
 
 and
 
 Guillory.
 
 In
 
 Guillory,
 
 the prospective juror, who had a fixed opinion, continued to maintain when questioned by the court that it would take “a whole lot of evidence to offset my opinion.”
 
 Id.,
 
 at 754. After subsequent questioning, Ms. Matherne exhibited the ability to disregard previous views and decide the
 
 *466
 
 case based upon the evidence presented at trial.
 
 See, Lindsey,
 
 948 So.2d at 108.
 

 Additionally, we find it appropriate to quote the following from the United States Supreme Court:
 

 The testimony of each of the three challenged jurors is ambiguous and at time contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal ease. It is well to remember that the lay persons on the panel may never have been subjected to the | ¡«type of leading questions and cross-examination tactics that frequently are employed.... Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge may choose to believe those statements that were most fully articulated or that appeared to have been least influenced by leading.
 
 Patton v. Yount,
 
 467 U.S. at 1038-1039, 104 S.Ct. at 2893.
 

 As a review of the entire voir dire does not reveal an abuse of discretion by the trial judge in denying the challenge for cause with regard to Ms. Matherne, there is no error. Because our review shows no abuse of discretion by the trial court in its rulings on these challenges for cause, this argument is without merit.
 

 The petit jury
 

 Defendant avers the denial of the second motion for change of venue combined with the denial of three challenges for cause resulted in a biased petit jury. Specifically he singles out three jurors, Mr. Charles Crowder, Mr. Lonnie Stafford, and Ms. Patricia Talley, contending because they were biased the presence of any one of them created an unfair tribunal that denied the defendant due process.
 

 We first note defendant accepted all of these jurors whose partiality he now questions. Neither the defense nor the trial court found any reason to even attempt to dismiss these jurors for cause. Nonetheless we have reviewed the voir dire of each of them and find no support for the defendant’s argument. Although Mr. Crowder had some knowledge of the case from the news and initially was uncertain as to whether he could be “totally objective,” he agreed he would abide by the principle that the defendant was innocent until proven guilty and that he would accept the judge’s instructions. Mr. Crowder clearly stated the State would have to prove the defendant guilty and he would not find the defendant guilty because of what was in 134the newspaper. He also agreed the defendant did not have to prove anything.
 

 Mr. Stafford acknowledged he had talked about the case with a friend who was acquainted with the victim and he had also read newspaper accounts of the offense in the past and recently. Initially he was biased toward finding the defendant guilty, but agreed that he understood the presumption of innocence and he would accept the judge’s charge to set aside any bias or opinion and decide the case solely on the evidence. He also agreed he could give the defendant a clean slate and would do his “dead level best” to be fair to the defendant.
 

 Ms. Talley did not know much about the case and had not formed an opinion or impression as to the defendant’s guilt or innocence. She also understood the presumption of innocence and the
 
 *467
 
 State’s burden of proof. In this appeal, defendant now takes issue with two of her answers to the defense’s questions. We find it illuminating to quote the following, with the now challenged answers in bold:
 

 Q. [By defense] I guess what this all comes down to Mrs. Talley, can you give all of us a fair trial, including the State and of course the defendant; can you be fair with all of us?
 

 A. I think so.
 

 Q. Can you be impartial?
 

 A. I hope so.
 

 Q. That is a tough question, like asking a person if they are a good person.
 

 A. (The witness indicates in the affirmative.)
 

 At the end of this colloquy, defense told Ms. Talley if she had any special problem that would prohibit her from being a juror she should state it now and that if she were chosen she would not be able to leave. After acknowledging there was nothing to prevent her from serving, the State and defense both accepted Ms. Talley.
 

 Bearing all of this mind, even if the defendant had attempted to challenge any Issof these jurors for cause, the trial court’s theoretical denial would not have been erroneous. There is nothing in this record to support any finding that these jurors could not render an impartial verdict based upon the law and evidence.
 

 For all of the reasons expressed above, this assignment of error is without merit.
 

 Batson challenges
 

 (Assignment of error 8)
 

 Defendant avers the State unconstitutionally exercised its peremptory challenges to strike African-Americans solely on the basis of race. Because defendant’s trial took place less than four months after the United States Supreme Court rendered
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a brief background is appropriate.
 

 In
 
 Swain v. Alabama,
 
 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court considered the issue of whether an African-American defendant was denied equal protection by the prosecutor’s exercise of peremptory challenges to exclude African-Americans from the petit jury. The Court sought to accommodate the prosecutor’s historical privilege of peremptory challenge free of judicial control, 380 U.S. at 214-220, 85 S.Ct. at 832-836, and the constitutional prohibition on exclusion of persons from jury service on account of race, 380 U.S. at 222-224, 85 S.Ct. at 837-838.
 
 Batson,
 
 476 U.S. at 91, 106 S.Ct. at 1720. The
 
 Swain
 
 majority, attempting to preserve the nature of the peremptory challenge, declared it could not hold the striking of African-Americans in a particular case is a denial of equal protection of the laws.
 
 Swain,
 
 380 U.S. at 221, 85 S.Ct. at 836. The Court reasoned that “[i]n the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that hfithe Constitution requires an examination of the prosecutor’s reasons for the exercise of his challenges in any given case.”
 
 Id.,
 
 380 U.S. at 222, 85 S.Ct. at 837.
 

 However, addressing the petitioner’s broader claim that not only were African-Americans removed by the prosecutor in his trial, but that there had never been an African-American on any petit jury in the county and that prosecutors in criminal cases consistently and systematically exercised peremptive strikes on African-Americans, the Court found this practice, if proven, to be in contravention of the Equal Protection Clause.
 
 Id.,
 
 380 U.S. at 222-
 
 *468
 
 224, 85 S.Ct. at 837-838.
 
 [9]
 

 Twenty-one years later, the Court reexamined that portion of
 
 Swain
 
 concerning the evidentiary burden placed on the criminal defendant who claims that he has been denied equal protection through the prosecutor’s use of peremptory challenges to exclude members of his race from the petit jury.
 
 Batson,
 
 476 U.S. at 82, 106 S.Ct. at 1714-1715. The Court observed that a number of lower courts interpreted
 
 Swain
 
 to require proof of repeated striking of African-Americans over a number of cases in order to establish a violation of the Equal Protection Clause.
 
 Id.,
 
 476 U.S. at 92, 106 S.Ct. at 1720.
 
 “Swain’s
 
 demand to make out a continuity of discrimination over time, however, turned out to be difficult to the point of unworkable,” thus the
 
 Batson
 
 court “recognized that this requirement to show an extended pattern imposed a ‘crippling burden of proof that left prosecutors’ use of peremptories ‘largely immune from constitutional scrutiny.’ ”
 
 Miller-El v. Dretke,
 
 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005) (quoting
 
 Batson,
 
 476 U.S. at 92-93, 106 S.Ct. 1712, 90 L.Ed.2d 69). Rejecting the
 
 Swain
 
 evidentiary formulation as inconsistent with standards developed since its rendition for assessing a prima facie case under the Equal Protection Clause, 476 U.S. at 93, 106 S.Ct. at 1721, the Court overruled
 
 Swain’s
 
 requirement of systemic exclusion, announcing in its place a three-step burden-shifting framework to be employed in evaluating an equal protection challenge to the prosecutor’s use of a peremptory strike.
 

 Under
 
 Batson
 
 and its progeny, the defendant challenging the peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Third, the trial court then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination.
 
 Batson,
 
 476 U.S. at 94-98, 106 S.Ct. at 1721-1724;
 
 Johnson v. California,
 
 545 U.S. 162, 168, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005);
 
 State v. Givens,
 
 99-3518, p. 5 (La.1/17/01), 776 So.2d 443, 448.
 

 To establish a prima facie case, the defendant must show: (1) the prosecutor’s challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venireperson on account of his being a member of that cognizable group.
 
 Batson,
 
 476 U.S. at 96, 106 S.Ct. at 1723;
 
 Givens,
 
 776 So.2d at 449. This three-prong showing by the defendant gives rise to “the necessary inference of purposeful discrimination” by the prosecutor.
 
 State v. Duncan,
 
 99-2615, p. 12 (La.10/16/01), 802 So.2d 533, 544 (quoting
 
 Batson,
 
 476 U.S at 96, 106 S.Ct. at 1723),
 
 cert. denied,
 
 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002)). “The inference is ‘necessary” because if such an inference cannot be drawn from the evidence presented by the defendant, he is unable to make a
 
 prima facie
 
 case of purposeful discrimination and his
 
 Batson
 
 challenge expires at the threshold.”
 
 Duncan,
 
 802 So.2d at 544 (quoting
 
 State v. Green,
 
 94-0887, p. 28 (La.5/22/95), 655 So.2d 272, 290 n. 24). If the trial court determines the defendant failed to
 
 *469
 
 establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the prosecutor to articulate neutral reasons (step two).
 
 Duncan,
 
 802 So.2d at 544.
 

 Here defendant filed a “motion to restrict the prosecution from using its peremptory challenge to exclude all blacks from the jury” on January 31, 1986. The motion, couched in terms dictated by
 
 Swain,
 
 alleged “the District Attorney and his staff have over a long period of time excluded members of the black race from being allowed to serve on the jury.” The motion contended it was anticipated the District Attorney would continue this practice of racial discrimination in the exercise of peremptory strikes. After this motion was filed, but prior to the hearing on the motion on July 29, 1986, the United States Supreme Court rendered
 
 Batson.
 
 At argument on the motion, the prosecutor noted “the Supreme Court has just ruled on this .... we can’t exclude all blacks from the jury, unless there is just cause.” The prosecutor informed the court that if the defense accused the prosecution “of excluding blacks for some racially biased reason” the State would have to justify exercising a peremptory. The motion was denied.
 

 During jury selection, defendant objected to the State peremptorily striking two African-American venirepersons. In this appeal, defendant contends he established a prima facie case of purposeful discrimination by the prosecution’s peremptory strike of Delois Evans. When defendant objected “because of the State’s systematic exclusion of blacks from the jury,” the trial court merely noted the objection and did not require the prosecutor to articulate a neutral reason. In argument to this Court, the defendant claims the trial court failed in its duty “to address the challenge, either by ruling on whether a prima facie case of discriminatory Usintent has been made or by requiring race-neutral reasons for the strikes.”
 
 State v. Myers,
 
 99-1803, p. 6 (La.4/11/00), 761 So.2d 498, 502. Relying heavily upon
 
 Myers
 
 and
 
 Givens,
 
 the defendant contends that the failure of the trial court to require the prosecutor to articulate deprives this Court of the basic data we need to undertake meaningful review.
 

 In reviewing the record to address the
 
 Batson
 
 issues, we note that because the decision was so recent, the manner in which both the State and the defense addressed the peremptory challenges to Delois Evans and Sandra Gross
 
 [10]
 
 is comparatively primitive.
 
 Bat-son
 
 is never identified by name in the record. Nevertheless, we are cognizant that appellate courts should resolve all cases on direct review in light of their “best understanding of governing constitutional principles.”
 
 Griffith v. Kentucky,
 
 479 U.S. 314, 323, 107 S.Ct. 708, 713, 93 L.Ed.2d 649 (1987) (quoting
 
 Mackey v. United States,
 
 401 U.S. 667, 679, 91 S.Ct. 1171, 1173, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring));
 
 State ex rel. Taylor v. Whitley,
 
 606 So.2d 1292, 1296 (La.1992),
 
 cert. denied)
 
 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993). Thus we approach the difficult task of deciding
 
 Bat-son
 
 issues from a trial held less than four months after
 
 Batson
 
 was rendered, bearing in mind that on appeal we must review these matters in light of the explanatory glosses placed upon
 
 Batson
 
 in the intervening twenty-four years.
 

 In deciding whether the defendant established a prima facie case of purposeful discrimination with regard to Delois
 
 *470
 
 Evans, our focus is upon the third required element: any relevant circumstances sufficient to raise an inference that the prosecutor struck her on account of her race.
 
 [11]
 
 The first two elements are not at issue; |4flMs. Evans was a member of a cognizable group, African-American, and the challenge was peremptory. The pivotal issue is whether the defendant established sufficient circumstances to raise an inference of discrimination by the State in its use of peremptory challenges.
 

 In
 
 Batson,
 
 the Court provided two illustrative examples of factors the trial court should consider in deciding whether a defendant has made the requisite showing. A “pattern” of strikes against a cognizable group of jurors in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor’s questions and statements during
 
 voir dire
 
 examination and in exercising challenges may support or refute an inference of discriminatory purpose.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723. The Court did not formulate any particular requirements for determining whether a defendant established a prima facie case. Rather, the Court expressed confidence in the trial judges’ ability to determine the establishment of a prima facie case.
 
 Id.
 
 Thus, the determination of the type and quantum of proof necessary to establish a prima facie case was left to the lower courts.
 
 Duncan,
 
 802 So.2d at 545. However, the establishment of a prima facie case is not to be so onerous that a defendant would have to persuade the judge— on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination.
 
 Johnson v. California,
 
 545 U.S. at 170, 125 S.Ct. at 2417. A defendant satisfies
 
 Batson’s
 
 first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination occurred.
 
 Id.
 

 |41At the conclusion of the examination of Ms. Evans, the State exercised its second peremptory strike. The defense objected “because of the State’s systematic exclusion of blacks from the jury.” The trial court excused Ms. Evans and noted the defense objection. The court also noted the tally of peremptory challenges used by both sides at this point.
 

 Ms. Evans was the eighteenth venireperson examined. The State’s previous peremptory was exercised upon Kent Sollie, race unknown, who stated he had a prior shoplifting conviction and was ambivalent about sitting in judgment of others. Prior to peremptorily challenging Ms. Evans, the State had moved to excuse four jurors for cause. Odis Pitts, an African-American, was excused because he could neither read nor write.
 
 [12]
 
 Mertle Johnson, an African-American, was excused due to
 
 *471
 
 her pregnancy. Steve Ivanyisky and Faye Achord, races unknown from this record, were both excused for their inability to consider the death penalty. The defense objection that the State was systematically excluding African-Americans from the jury can only be supported by taking the State’s cause challenges into account. The prosecutor had articulated race-neutral reasons for excluding the identifiable African-Americans for cause. The trial court could take this into account in assessing whether the single peremptory strike against Ms. Evans demonstrated circumstances sufficient to raise an inference of purposeful discrimination.
 

 However, the Constitution forbids even the striking of even a single prospective juror for a discriminatory purpose.
 
 Snyder v. Louisiana,
 
 552 U.S. 472, 478, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008). Therefore we have closely examined the voir dire of Ms. Evans to decide if the trial court erred in implicitly finding the defendant failed to establish a prima facie case of purposeful ^discrimination. We find there was nothing obvious in Ms. Evans’s voir dire colloquy that might have raised a reasonable inference of racial exclusion. It is readily apparent that she did not have a clear grasp of the questions being asked, was unable to follow the focus of some questions, and often gave confusing answers. The following evinces her confusion regarding evaluation of the credibility of witnesses:
 

 Q. [By the State] Now, if we put five witnesses up on the witness stand to testify that it happened one way and they put five witnesses up on the witness stand to testify it happened another way, do you know how you would try to decide which one to believe?
 

 A. No, sir, I don’t believe so. Well, like I said, one — Okay. One side is on one side and the other is on this side and I mean, that that side is going to go against me or whatever. Is that what you are talking about?
 

 Q. Right. You would have to make a decision—
 

 A. Yeah.
 

 Q. How would you make your decision?
 

 A. Okay. On what now?
 

 When asked to describe the role of the trial court judge in a case, she responded, “Well, he tell the person, you know, what done did something his time, you know, that he gets and different stuff like that. You know, I mean, he gives you so many years or either life one.” The prosecutor asked, “How do you feel about the death penalty?” Her response was “Well, I feel it — it should be something did about it.” The following colloquy occurred between the prosecutor and Ms. Evans:
 

 Q. I think I might have misunderstood you a few minutes ago. Tell me, what does the death penalty mean to you; when I say death penalty, what does that mean to you?
 

 A. Well, that is somebody done kill somebody, huh?
 

 Q. Okay. What else does it mean to you?
 

 A. It means that they should be punished.
 

 Q. And what else?
 

 14,A- And like, you know, I mean it should be something did about it.
 

 [[Image here]]
 

 Q. When you say something should be done about it, what do you mean?
 

 A. You know, you put them in the pen or whatever.
 

 Ms. Evans was also unclear about her ability to impose the death penalty:
 

 Q. After we have discussed the death penalty again, can you tell me what your
 
 *472
 
 appreciation of the death penalty is all about.
 

 A. Yes, sir. You know, like I said, I mean I can tell you some of it, like I say, somebody just, you know, killed somebody, it just be something did about it.
 

 Q. And one of the things that can be did about it is give them the death penalty? Is that right?
 

 A. Right.
 

 Q. And if you are serving on this jury, can you give this man the death penalty if you think that he killed somebody and that under the facts he ought to get the death penalty?
 

 A. Right.
 

 Q. Can you do it?
 

 A. Who? Me?
 

 Q. Yes.
 

 A. I can’t do it, could I?
 

 Q. No, ma’am.
 

 A. I don’t really understand what you are saying.
 

 It is clear from the voir dire and all relevant circumstances that there were obvious reasons for the trial judge to determine the defendant failed to establish the threshold requirements of a prima facie case of purposeful discrimination. Although defendant avers that because there was no express factual finding by the trial judge on whether the defendant had met his burden the ruling is unreviewable, we find this matter distinguishable from
 
 Givens, supra,
 
 and
 
 Myers, supra.
 

 In
 
 Myers,
 
 we held that when a
 
 Batson
 
 challenge is made, it is incumbent upon |44the trial judge to address the challenge, either by ruling on whether a prima facie case of discriminatory intent has been made or by requiring neutral reasons for the strike.
 
 Myers,
 
 761 So.2d at 502. The trial judge’s rulings and observations are integral to a review of a
 
 Batson
 
 challenge because of his or her unique role in the dynamics of a voir dire.
 
 Id.
 
 However, in
 
 Myers
 
 the record did “not support or explain the judge’s dismissive attitude toward defense counsel’s repeated requests for race-neutral reasons.”
 
 Id.
 
 In
 
 Givens,
 
 we noted that in
 
 Myers
 
 “there were no obvious reasons for the state’s peremptory challenges apart from race.”
 
 Givens,
 
 776 So.2d at 450. In
 
 Givens,
 
 we similarly found there was no obvious reasons for the prosecutor’s strikes other than for gender, and because the trial judge failed to explain its presumed finding that the defense did not establish a prima facie case, we remanded.
 
 Id.,
 
 776 So.2d at 450-451. In this matter
 
 sub judice,
 
 there are obvious reasons for the peremptory challenge of Ms. Evans, which. could even have supported a challenge for cause. Although mindful that “[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation”,
 
 Johnson v. California,
 
 545 U.S. at 172, 125 S.Ct. at 2418, we do not speculate here. Although the best practice is for the trial judge to articulate reasons for a ruling on whether the party challenging the peremptory strike established a prima facie case of purposeful discrimination, even reviewing the trial court’s implicit ruling in light of our best understanding of governing constitutional principles, we find no merit to the defendant’s argument that counsel raised a sufficient inference of purposeful discrimination with regard to Ms. Evans.
 

 Defendant also avers the prosecution impermissibly exercised a peremptory exception to strike Sandra Gross, an African-American. After the State exercised its peremptory strike, defense counsel assigned error, arguing it was obvious that she 14fi“was perfectly capable, qualified and willing to be a juror” and there was “no reason she should be excused.” Counsel contended “the State is on the course of
 
 *473
 
 systematically excluding any and all blacks from this jury.” The prosecutor immediately responded with reasons for the strike, observing that he felt Ms. Gross was not truthful in response to his questions of whether she knew an investigator from his office. Continuing, the prosecutor stated the investigator from his office had been to the house Ms. Gross and her mother lived in to investigate a matter, yet Ms. Gross denied ever seeing him and denied the existence of the matter despite being present at the time of his visit. He also proffered that Ms. Gross did not have “the type of employment record and social involvement” that it would like to see in a prospective juror. The TC simply overruled the objection.
 

 Because the prosecutor offered a neutral reason, the question of whether the defendant had made a prima facie showing of intentional discrimination is rendered moot.
 
 Hernandez v. New York,
 
 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). Our analysis proceeds to the second and third steps of
 
 Batson
 
 review and addresses the question of whether the trial court abused its discretion in finding the defendant did not carry the ultimate burden of proving purposeful discrimination.
 

 In this appeal, defendant avers Ms. Gross’s employment status did not differentiate her from unemployed Caucasian jurors whom the State did not strike. Ms. Gross stated she had not worked outside the home since she became a mother, some four years before. The defendant correctly notes the Supreme Court has held “[i]f a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at
 
 Batson’s
 
 third step.”
 
 Miller-El,
 
 545 U.S. at 241, 125 S.Ct. at 2325.
 

 146The defendant also contends the State’s explanation regarding lack of social involvement raises an inference of purposeful discrimination because the prosecution did not question Ms. Gross about her social involvement. The only question which could even be construed as pertaining to social involvement was the question of what “religious affiliation” did she follow. Ms. Gross responded “holiness.” The prosecutor followed by asking if her church taught that it was not right for her to sit in judgment of her fellow man. Ms. Gross answered “[r]ight at this moment I don’t belong to the church.” The defendant argues even if these questions could form the basis of a strike on the ground of social involvement, this reason must fail for three reasons. First, the use of peremptory challenges to strike jurors on the basis on membership in a religious organization,
 
 vel non,
 
 violates multiple constitutional principles. Second, religious affiliation of Caucasian jurors played no part in the State’s exercise of its strikes. Third, the answer to a single question, absent any follow-up, cannot qualify as a valid explanation for a strike.
 
 See, e.g., Splunge v. Clark,
 
 960 F.2d 705, 707-708 (7th Cir.1992) (single “cursory question” cannot support strike);
 
 Ex parte Nguyen,
 
 751 So.2d 1224, 1227 (Ala.1999) (“[T]he State’s failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.”)
 

 While these are valid points regarding the employment status of some of the other venirepersons, in addition to the speciousness of the “social involvement” reason, the fact the State felt Ms. Gross was lying about her prior interaction with a state investigator is a thoroughly race-neutral reason for a peremptory challenge. Accepting as correct, only for purposes of
 
 *474
 
 this appeal, that the prosecution’s alternative arguments provided an insufficient basis for upholding the peremptory 147challenge, we nevertheless find the trial court did not err upholding the challenge. The prosecution’s principal reason, that Ms. Gross was untruthful, was facially neutral and case-specific in the sense that it called into question her other responses under oath during voir dire and thus her qualifications to sit as a juror. After learning from Ms. Gross that she lived with her mother, Selena LeGrue,
 
 [13]
 
 the following colloquy took place:
 

 Q. [By the State] Ms. Gross, do you recognize this gentlemen [sic] seated in the chair right here?
 

 A. No.
 

 Q. You don’t ever remember him coming to your house before?
 

 A. No.
 

 Q. He is with the district attorney office.
 

 A. No, I ain’t never saw him.
 

 Q. Let me ask you a little more. Do you recall an incident where he came to your house and investigating a matter involving a bad check?
 

 A. No. I don’t even have a checking account.
 

 Q. What about your mother?
 

 A. She has one, but he has never come to my house.
 

 Q. You don’t remember this man right here?
 

 A. He has never come to my house.
 

 Q. Have you ever been involved in a criminal proceeding of any kind before, as a witness or juror or anything?
 

 A. No.
 

 Responding to defense counsel’s objection to the peremptory challenge of Ms. Gross, the district attorney stated he did not feel Ms. Gross was truthful because “an investigator from my office knows Ms. Gross, knows her mother, has personally been |4Sto the house in which she lives on the investigation of a criminal matter, and yet she denied knowing him or ever seeing him before or the existence of that matter and she was present at the time.” After the prosecutor articulated his reasons for the strike, the trial court simply noted and overruled the defendant’s objection.
 

 At the second step of the
 
 Batson
 
 inquiry, the issue is the facial validity of the prosecutor’s explanation.
 
 Hernandez,
 
 500 U.S. at 360, 111 S.Ct. at 1866;
 
 Burkett v. Elem,
 
 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995)
 
 (per curiam
 
 ). Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race-neutral.
 
 Id.
 

 The defendant contends that because the trial judge did not assess on the record the weight and credibility of the prosecutor’s explanation and articulate a reason for accepting the prosecution’s reason as race-neutral, the trial judge did not complete the third step of the
 
 Batson
 
 framework, resulting in an inability for there to be meaningful review. To the contrary, although the better practice is for the trial court to establish for the record its evaluation of the justification offered to rebut the inference of purposeful discrimination, the trial court here did not err in failing to rule expressly, when the reason given by the State was facially race-neutral, self-explanatory and related to the case. There was no discriminatory intent inherent in this explanation.
 

 Moreover, neither
 
 Batson
 
 nor any of its progeny have established guidelines for a trial court performing step three of the analysis. In
 
 Snyder v. Louisiana,
 
 the Su
 
 *475
 
 preme Court noted that after the prosecutor offered his explanation for striking the juror, the trial judge simply ruled that he would allow the challenge.
 
 Snyder,
 
 552 U.S. at 478-479, 128 S.Ct. at 1208. In the absence of any specific findings by the trial judge, the Supreme Court considered both reasons offered by the prosecutor for excluding the juror, found the second reason insufficient “even under the highly | ^deferential standard of review that is applicable here”,
 
 id.,
 
 552 U.S. at 479, 128 S.Ct. at 1209, and reversed the defendant’s conviction and death sentence. The lack of specific findings by the trial judge meant only that the Court would not presume the judge credited the first reason advanced by the prosecutor for excluding the juror,
 
 i e.,
 
 that he appeared nervous.
 
 Id.
 
 If
 
 Batson’s
 
 third step required express and specific findings by the trial judge, the extended analysis conducted by the Court regarding the second reason proffered would not have been required.
 
 See Pruitt v. State,
 
 986 So.2d 940, 946 (Miss.2008)
 
 (“Batson ...
 
 did not articulate a particular means of accomplishing the third step.... The Supreme Court has not since required trial courts to employ any specific process in carrying out steps two and three of the
 
 Batson
 
 procedure. On the contrary, the Supreme Court has stated ‘[w]e adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it.’ ”) (quoting
 
 Miller-El v. Cockrell,
 
 587 U.S. 322, 347, 123 S.Ct. 1029, 1045, 154 L.Ed.2d 931 (2003)). The
 
 Pruitt
 
 court, with regard to the quote from
 
 Miller-El,
 
 wrote:
 

 A number of courts have used this statement to reject the argument that a trial court must make specific findings of fact regarding the proffered race-neutral reasons.
 
 See e.g., State v. Frazier,
 
 115 Ohio St.3d 139, 152, 873 N.E.2d 1263 (2007) (while more thorough findings would have been helpful, “the trial court is not compelled to make detailed factual findings to comply with
 
 Batson
 
 ”);
 
 Lamon v. Boatwright,
 
 467 F.3d 1097, 1101 (7th Cir.2006) (where a trial court failed to make findings on each proffered reason, it is sufficient if the appellate court can infer from the record that the trial judge engaged in the step-three inquiry);
 
 Messiah v. Duncan,
 
 435 F.3d 186, 198 (2d Cir.2006) (“As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his
 
 Batson
 
 ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a
 
 Batson
 
 challenge.”)
 

 Pruitt,
 
 986 So.2d at 946.
 

 E.g., United States v. Grant,
 
 563 F.3d 385, 389 (8th Cir.2009),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 1504, 176 L.Ed.2d 118 (2010);
 
 People v. Hamilton,
 
 45 Cal.4th 863, 89 Cal.Rptr.3d 286, 200 P.3d 898, 931 (2009), cer
 
 t. denied,
 
 - U.S. -, 130 S.Ct. 74, 175 L.Ed.2d 52 (2009). Discussing step three of the
 
 Batson
 
 analysis, the Supreme Court noted it had recognized these determinations of credibility lie “peculiarly within the trial judge’s province” and “in the absence of exceptional circumstances we would defer to the trial court.”
 
 Snyder,
 
 552 U.S. at 477, 128 S.Ct. at 1208 (internal citations omitted).
 

 The defendant also takes issue with the trial court’s acceptance of the prosecutor’s assertion, without evidence, that the investigator had been to Ms. Gross’s house and that Ms. Gross was present during his visit. Defendant contends appellate courts reviewing similar situations have found error. After reviewing the cases cited in the defendant’s brief, we find that they do not
 
 *476
 
 support his position.
 
 [14]
 
 In
 
 State v. Cruz,
 
 175 Ariz. 395, 857 P.2d 1249 (Ariz.1993), the court addressed whether the trial court erred in accepting the prosecutor’s proffered reason for striking a Latina from the jury. The court held where “the state offers a facially neutral, but wholly subjective, reason for a peremptory strike, it must be coupled with some form of objective verification before it can overcome the prima facie showing of discrimination.”
 
 Id.,
 
 857 P.2d at 1253. This is distinguishable from the instant case. There, the prosecutor struck the juror because he thought she was weak and would be led and she had “poor contact with me.” Here, the State did not strike Ms. Gross for a wholly subjective reason.
 

 Defendant also relies upon a partial quote from
 
 Browner v. State,
 
 872 So.2d 1 (Miss.2004) to support his argument. We find it appropriate to fully quote the
 
 dicta
 
 in that opinion, where the court “felt compelled to address the practice of striking potential jurors in criminal trials based on information gathered from outside sources, | fi1 often law enforcement officers, when those sources are not revealed or are not available for questioning”:
 

 While we do not hold today that our trial judges should conduct a “mini-hearing” within a
 
 Batson
 
 hearing each time a peremptory challenge is exercised based on information gained from outside sources, we do depend on the trial courts to exercise caution to ensure that peremptory challenges based on information from outside sources is credible and supported by on-the-record factual findings to this effect and that a complete record is made on this issue. If in doubt about the validity of outside information, the trial court should do what is necessary to ensure the proposed reasons are non-pretextual. This may include questioning the outside source on the record.
 

 Id.,
 
 872 So.2d at 11-12.
 

 In short, we find no support for the defendant’s argument that the trial court erred in accepting the State’s strike of Ms. Gross because she denied ever seeing the investigator, present in the courtroom, who had been to her home to investigate a matter possibly involving her mother. The final step of
 
 Batson
 
 involves evaluating the persuasiveness of the justification proffered, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.
 
 Rice v. Collins,
 
 546 U.S. at 338, 126 S.Ct. at 974;
 
 Purkett v. Elem,
 
 514 U.S. at 768, 115 S.Ct. at 1771. We have examined the evidence put forth by the defendant at trial and find he failed to meet his burden. This assignment of error is without merit.
 

 GUILT PHASE
 

 Eyewitness Identification
 

 (Assignment of error 11)
 

 Defendant claims the trial court erred in admitting the testimony of Michael Harper because the identification he made was the unreliable product of suggestive identification techniques. Mr. Harper was not shown a photo of the suspect after the incident. He testified he was shown a single photo and he thought this was at the time |fi2of a hearing in 1984. Defendant contends the courts have unfavorably viewed this practice of a single photo identification, finding it suggestive.
 
 *477
 
 Defendant also contends the identification was suggestive because he was seated at the defense table when Mr. Harper testified, identifying him. Moreover, defendant avers the identification was unreliable because the police never asked Mr. Harper to describe the shooter and two and one-half years passed between the crime and the trial. Defendant also avers Mr. Harper’s testimony made it clear he never got a good view of the shooter.
 

 A defendant attempting to suppress an identification must prove
 
 both
 
 that the identification itself was suggestive and that there was a likelihood of misiden-tifieation as a result of the identification procedure.
 
 State v. Prudholm,
 
 446 So.2d 729, 738 (La.1984). An identification procedure is unduly suggestive if, during the procedure, the witness’s attention is unduly focused on the defendant.
 
 State v. Robinson,
 
 386 So.2d 1374, 1377 (La.1980). For this reason, identifications arising from single-photograph displays may be viewed in general with suspicion.
 
 Simmons v. United States,
 
 390 U.S. 377, 383, 88 S.Ct. 967, 970-971, 19 L.Ed.2d 1247 (1968);
 
 State v. Martin,
 
 595 So.2d 592, 595 (La.1992). The central question, however, is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.
 
 Neil v. Biggers,
 
 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Thus, despite the existence of a suggestive pre-trial identification, an in-court identification is permissible if, under all the circumstances, there does not exist “a very substantial likelihood of irreparable misidentification.”
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) (quoting
 
 Simmons,
 
 390 U.S. at 384, 88 S.Ct. at 971).
 

 Isalf an identification procedure is suggestive, courts must look, under the totality of the circumstances, to several factors in evaluating the likelihood of mis-identification.
 
 Neil v. Biggers,
 
 409 U.S. at 199, 93 S.Ct. at 382;
 
 Martin,
 
 595 So.2d at 595. These factors include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.
 
 Biggers,
 
 409 U.S. at 199-200, 93 S.Ct. at 382;
 
 Brathwaite,
 
 432 U.S. at 114, 97 S.Ct. at 2253;
 
 Martin,
 
 595 So.2d at 595.
 

 Mr. Harper testified that he was eating supper at Hi Ho Sam’s on February 2, 1984. As he was walking out of the door a black gentleman was walking out of the door at the same time. Mr. Harper was asked if he could identify this man, and he identified the defendant seated in the courtroom. Mr. Harper also saw Deputy Toefield seated in his car; Mr. Harper thought Deputy Toefield was one of his former teachers and was preparing to go over there and speak with him. As Mr. Harper was looking at Deputy Toefield, he saw the defendant walk over to Deputy Toefield and the interaction between those two. Mr. Harper then saw Deputy Toe-field begin to handcuff the defendant while defendant was facing the police car with his hands on top of it. He saw the defendant turn around and heard a shot. He saw Deputy Toefield start to fall and saw the defendant shoot him two more times. When he saw the victim shot in the face, Mr. Harper backed up to his truck. The defendant went at a fast pace behind the building and then emerged from the left back corner of the building. The defendant and Mr. Harper looked at each other, and defendant began to flee. Mr. Harper once again identified the defendant in the
 
 *478
 
 courtroom as the man who shot Deputy Toefield and ran away.
 

 [S4On cross-examination, he described the defendant’s hair as not long but not short, styled in a “messed up curl.” He also described the defendant as having a scraggly beard at the time of the shooting. With regard to the photograph he was shown, Mr. Harper testified he was not asked to identify the person in the photograph. There appeared to be some confusion as to whether Mr. Harper was told the photograph was of the defendant and whether he was told the man in the photograph was the man who shot Deputy Toe-field. In any event, Mr. Harper unequivocally identified the defendant in court.
 

 Even assuming
 
 arguendo
 
 that the showing of the photograph to Mr. Harper was an out-of-court identification and further that this was impermissibly suggestive,
 
 State v. Madison,
 
 345 So.2d 485, 490 (La.1977) (in-court identification where accused sits at the defense table and may be the only black person in the courtroom may be highly suggestive) and
 
 United States v. Rogers,
 
 126 F.3d 655, 658 (5th Cir.1997) (it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant, requiring the application of the five
 
 Biggers
 
 factors), the application of the
 
 Biggers/Brathwaite
 
 factors leads to the conclusion there was no substantial likelihood of irreparable misidentification. We find no support for defendant’s contention the in-court identification was highly suggestive. Nevertheless, weighing all the factors, we determine the likelihood of mis-identification was insubstantial. Mr. Harper’s testimony was properly before the jury.
 

 Mr. Harper had ample opportunity to view the criminal at the time of the crime. He saw the defendant as they were exiting Hi Ho Sam’s, he observed the defendant approach and interact with Deputy Toe-field, he saw the shooting and he and the defendant looked at each other immediately before the defendant began to flee.
 

 |fiSMr. Harper paid an above-average amount of attention. He was looking directly at Deputy Toefield and was about to approach him, as he thought he recognized Deputy Toefield as someone he knew. The degree of Mr. Harper’s attention can also be demonstrated by his in-court description of the defendant’s appearance on the day of the crime. He described the defendant as having a hairstyle of a “messed-up curl” that was neither long nor short. In subsequent testimony by Hammond Police Chief Roddy Devall, the wig defendant was wearing at the time of his capture was admitted into evidence. The hair is neither long nor short and is curly. In addition, a photograph of the defendant and Annie Broadway taken in a photo booth at the Hammond Square Mall earlier in the day of the shooting and admitted into evidence during Ms. Broadway’s testimony depicts the defendant with medium-length curly hair. Ms. Broadway testified that this was defendant in the photo and that he was wearing a “curl wig.” Additionally, this photograph confirms Mr. Harper’s testimony that the defendant had a short, scraggly beard that was not “real thick.”
 

 From this record, it does not appear Mr. Harper gave a prior description of the defendant, so this factor weighs neither in favor of, nor against, reliability.
 
 United States v. Rogers,
 
 126 F.3d at 659.
 

 At trial, Mr. Harper unequivocally identified defendant as the man who shot Deputy Toefield. There was no hesitancy or discrepancy in his testimony; he demonstrated a level of absolute certainty.
 

 The time between the crime and confrontation was two and one-half years. In
 
 *479
 

 Biggers,
 
 the Court found a lapse of seven months would be a seriously negative factor in close cases.
 
 Id.,
 
 409 U.S. at 201, 93 S.Ct. at 383. Thus the time period factor is unfavorable for reliability. Nonetheless this is only one factor. We cannot say, | ¿(¡considering all of the factors under the totality of the circumstances, that there was a very substantial likelihood of irreparable misidentification. This assignment of error is without merit.
 

 Shackling of defendant during trial
 

 (Assignment of error 9)
 

 The defendant contends his due process rights were violated when he was forced to remain in leg shackles throughout the guilt and penalty phases of his trial. In a motions hearing held prior to voir dire, the defendant argued that his appearance before the jury in shackles prejudiced his presumption of innocence and right to a fair trial. He also argued there was no indication he was going to be dangerous or violent. In response, the State argued the court’s decision to remove the handcuffs and waist belt, leaving only the leg shackles, properly balanced the defendant’s rights with the safety of court personnel. Denying the motion, the court found all shackles except the ankle shackles had been removed, which would not affect the presumption of innocence. The court did not believe the jury could see the ankle shackles under the table.
 

 In
 
 Deck v. Missouri,
 
 the Supreme Court, after considering its precedents of
 
 Illinois v.
 
 Allen
 
 [15]
 
 and
 
 Holbrook v.
 
 Flynn,
 
 [16]
 
 and noting “a lower court consensus |,^disapproving routine shackling dating back to the 19th century,” concluded the Due Process Clause of the United States Constitution “prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.”
 
 Deck v. Missouri,
 
 544 U.S. 622, 629, 125 S.Ct. 2007, 2012, 161 L.Ed.2d 953 (2005). Although previously the Court had suggested the rule that shackling is inherently prejudicial and should only be permitted where justified by an essential state interest formed part of the Fifth and Fourteenth Amendments’ due process guarantees,
 
 Deck
 
 at 627-628, 125 S.Ct. at 2011, in
 
 Deck
 
 the Court conclusively held this rule is a due process right.
 

 
 *480
 
 The issue before the Court in
 
 Deck
 
 was whether shackling during the penalty phase of a capital trial violates the Constitution of the United States. The Court held the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest specific to the defendant on trial.
 
 Id.,
 
 at 624, 125 S.Ct. at 2009. The Court further instructed that “where a court, without adequate justification orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove ‘beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.”’
 
 Deck,
 
 544 U.S. at 635, 125 S.Ct. at 2015-2016 (quoting
 
 Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
 
 [17]
 

 | fflThus, when a defendant raises as error on appeal his being shackled at either the guilt or penalty phase, or both, appellate review is a two-step process. The first step is whether the trial court abused its discretion in determining shackling is justified by a state interest specific to the trial.
 
 Deck,
 
 544 U.S. at 633, 125 S.Ct. at 2015;
 
 see also United States v. Banegas,
 
 600 F.3d 342, 346 (5th Cir.2010) (The threshold question is whether the district court articulated specific reasons for shackling the defendant.);
 
 United States v. Miller,
 
 531 F.3d 340, 345 (6th Cir.2008),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 307, 172 L.Ed.2d 223 (2008). If the trial court did not abuse its discretion, the analysis is at an end. However, if it is determined the court did not have adequate justification to order the defendant to wear shackles visible to the jury, the second step is a harmless error review.
 
 Deck,
 
 544 U.S. at 635, 125 S.Ct. at 2015;
 
 Miller,
 
 531 F.3d at 346. On the record before us, we find no abuse of the trial court’s discretion in having the defendant in leg shackles during his trial.
 

 We first note the trial court determined the jury could not see the shackles. It is clear from
 
 Deck
 
 the shackles must be visible to the jury in order for a Due Process concern to arise; the Court refers to “visible” restraints “seen” by the jury no less than four times in its opinion. The record was clear that the jury knew the defendant was shackled.
 
 Deck,
 
 544 U.S. at 634, 125 S.Ct. at 2015. In contrast, where the restraints are not visible to the jury, prejudice is not inherent.
 
 United States v. Wardell,
 
 591 F.3d 1279, 1293 (10th Cir. 2009);
 
 United States v. Baker,
 
 432 F.3d 1189, 1246 (11th Cir.2005);
 
 State v. Johnson,
 
 148 N.M. 50, 229 P.3d 523, 533 (2010). There is no indication in the record before us that the jury ever saw or could see the shackles. Thus the factors tending to show prejudice are not present. The defendant’s presumption of innocence was not violated.
 
 Deck,
 
 544 U.S. at 630, 125 S.Ct. at 2013 (“Visible shackling undermines the presumption of innocence and the related fairness of the [^factfinding process.”) Nor is there any assertion or evidence the shackles interfered with the defendant’s ability to communicate with counsel or was a factor in his decision to not testify.
 
 Id.,
 
 at 631, 125 S.Ct. at 2013. Finally, there is no evidence the dignity of the judicial pro
 
 *481
 
 cess was undermined.
 
 Id.
 
 (“The routine use of shackles in the presence of juries would undermine” the importance of guilt or innocence, “the gravity with which Americans consider any deprivation of an individual’s liberty through criminal punishment,” and the “seriousness of purpose that helps to explain the judicial system’s power to inspire the confidence and affect the behavior of a general public whose demands for justice our courts seek to serve.”)
 

 Moreover, we find the trial court did not abuse its discretion in determining shackling was necessary because of specific concerns about the defendant. Understandably, the trial court did not fully articulate reasons or make formal findings of the special circumstances that called for shackling, as it was not required at the time of this trial.
 
 [18]
 
 Nonetheless, “the record itself makes clear that there are indisputably good reasons for shackling” specific to this defendant.
 
 Deck,
 
 544 U.S. at 635, 125 S.Ct. at 2015;
 
 Banegas,
 
 600 F.3d at 345 (“Even when a court has not stated the reasons for its decision to shackle a defendant, ... the reasons therefor might nevertheless be apparent when viewed in light of the specific facts of the case.”)
 

 The defendant was accused of killing a police officer, by pulling a gun from the crotch of his pants after Deputy Toefield had secured the defendant’s left hand in a handcuff. There was also evidence before the court that the warden had learned the defendant and three other inmates had formulated an escape plan and a “shank” was 1 fipfound in the cell of one of those inmates. The defendant was already serving a 99-year sentence for armed robbery. Given these reasons, it is apparent there were security concerns specifically related to this defendant. This assignment of error is without merit.
 

 PENALTY PHASE
 

 Ineffective Assistance of Counsel claim
 

 (Assignment of error 13)
 

 Defendant avers his counsel failed to subject the prosecution’s case at the penalty phase to meaningful adversarial testing. He contends the failure to present an opening argument at the outset of the penalty phase, the failure to present an adequate penalty phase case, including failure to object to the State’s late introduction of its case in chief, and the delivery of an unprepared closing argument, constituted ineffective assistance of counsel. According to defendant, counsel did not prepare for the penalty phase and therefore offered no opening statement, no evidence, and no objections.
 

 At the commencement of the penalty phase, the State said it had no evidence to introduce other than what had been introduced in its case in chief. The defense stated it had no other evidence other than that already in evidence. The State then immediately proceeded to its closing argument, followed by the defense’s closing argument. At the conclusion of the defense argument, the State moved to introduce into evidence its evidence from its case in chief. The defense then asked that all evidence be introduced, and the State proceeded to its rebuttal argument. This was the extent of the penalty phase.
 

 A defendant at the penalty phase of a capital trial is entitled to the
 
 *482
 
 assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for 1filhis life.
 
 State v. Hamilton,
 
 92-2639, p. 6 (La.7/1/97), 699 So.2d 29, 32,
 
 cert. denied,
 
 522 U.S. 1124, 118 S.Ct. 1070, 140 L.Ed.2d 129 (1998);
 
 State v. Sanders,
 
 93-0001, p. 25 (La.11/30/94), 648 So.2d 1272, 1291,
 
 cert. denied,
 
 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). A capital sentencing proceeding “is sufficiently like a trial in its adversarial format and in the existence of standards for decision” such that counsel’s role in both is “to ensure that the adversarial testing process works to produce a just result under the standards governing decision.”
 
 Strickland v. Washington,
 
 466 U.S. 668, 686-687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984);
 
 Accord Sanders,
 
 93-0001, at p. 25, 648 So.2d at 1291. When a defendant challenges the effectiveness of his counsel at the penalty phase, the court must determine whether there is a reasonable probability that, absent counsel’s errors, the sentencer would have concluded the balance of aggravating and mitigating factors did not warrant death.
 
 Strickland,
 
 466 U.S. at 695, 104 S.Ct. at 2069;
 
 Hamilton,
 
 92-2639 at p. 6, 699 So.2d at 32;
 
 Sanders,
 
 93-0001, at p. 25, 648 So.2d at 1291. Unless defendant shows both a deficient performance and prejudice, the court cannot find his death sentence resulted from a breakdown of the adversarial process which rendered the result unreliable.
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. at 2064;
 
 Sanders,
 
 93-0001 at pp. 25-26, 648 So.2d at 1291.
 

 In
 
 Strickland,
 
 the Court established the legal principles that govern claims of ineffective assistance of counsel with the following:
 

 A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence |fi2resulted from a breakdown in the adversary process that renders the result unreliable.
 

 Id.,
 
 466 U.S. at 687, 104 S.Ct. at 2064. Our review of defendant’s ineffective assistance of counsel claim is guided by these premises.
 

 Regarding the lack of an opening argument at the penalty phase, the- defendant notes “[t]his court has come close to stating that an attorney’s failure to make an
 
 opening
 
 statement constitutes ineffectiveness
 
 per se. See [State v.] Clark,
 
 492 So.2d [862,] 872 [ (1986) ] (failure to make opening statement ‘inappropriate’ and ‘inexplicable’);
 
 [State ex rel.] Busby,
 
 538 So.2d [164,] 173 (failure to make opening statement important factor in determining whether penalty phase assistance of counsel ineffective).”
 
 Sanders,
 
 93-0001 at p. 27, 648 So.2d at 1292. Although we have never held that the failure to give an opening statement is in and of itself ineffective assistance of counsel, the failure to make an opening statement is a factor this Court considers in deciding whether counsel’s performance is deficient.
 

 Defendant contends counsel erred in failing to object to the State’s alleged late introduction of its penalty phase case in chief, after the time for presentation of evidence had passed. There is no merit to
 
 *483
 
 this argument. Before the beginning of closing argument, the State declared the evidence it had to introduce was that already produced in the guilt phase. Prior to its rebuttal, the State moved to introduce that evidence. There was no additional evidence presented after the closing argument; defense counsel’s failure to object does not rise to the level of deficient performance, where the State declared it would introduce this evidence prior to its argument but merely failed to formally move for its introduction, an oversight also committed by defense counsel.
 

 In brief to this Court, defendant argues the closing argument did not meet | ^constitutional standards,
 
 i. e.,
 
 a “perfunctory” or “lackluster” argument or one which does not “emphasize to the jurors any of their legal obligations designed to prevent the arbitrary or capricious imposition of the death penalty” constitutes ineffective assistance.
 
 Sanders,
 
 93-0001 at p. 27, 648 So.2d at 1292. In reviewing defendant’s argument that the closing argument was deficient or prejudicial, we find it appropriate to reiterate the argument in its entirety:
 

 Ladies and gentleman of the jury, once again, my name is Wayne Stewart and I represent the defendant, Thomas Sparks. What do you say when you are begging for a man’s life? I don’t really know. [La.Code Cr. Proe.] Article 905.4 list the aggravating circumstances that you can consider in this situation. I believe there are ten different aggravating circumstances. The Statute says that you must find a minimum of one. In this case the state is alleging the minimum. One. I firmly do not believe that this is an electric chair case. You have found beyond a reasonable doubt that Thomas Sparks is guilty. Now, its incumbent on you to decide whether or not he lives or dies. What happened to Deputy Toefield is by no means nice. As I indicated to you in my other argument, I can’t think of any killing situation that would be nice. If this were a situation where Thomas Sparks had killed some children or babies or perhaps some of the other aggravating circumstances that are listed, it would be more difficult for me to argue this to you. [La.Code Cr. Proc.] Article 905.5, which I believe the judge is going to give you a copy of, list some of the mitigating circumstances. In other words, the circumstances that you can consider in deciding against the death penalty. There has been no evidence introduced whatsoever of significant pri- or criminal history. I think the facts of this case indicate that what occurred happened out of haste, out of fear, perhaps out of stupidity. If Thomas Sparks would have foreseen what was happening — I believe the facts indicate that he had the opportunity to turn the car around and drive the other direction. Also, if this were some sort of a premeditated or preplanned situation — The photographs that were introduced into evidence show that he could have easily got back in the car and driven off. He didn’t. He did the most irrational thing that he could have done and that was take off running in the woods. If this were a preplanned hiding out situation where a police officer was killed, it would be totally different. It was an emotional situation.
 

 The situation happened out of fear. Some of the other mitigating circumstances is whether or not the defendant’s capacity to appreciate his action was impaired by intoxication or otherwise. Don’t misunderstand me, I do not think that intoxication, whether it be from alcohol or dope would justify what has occurred here. But I do think it would mitigate the situation to such a
 
 *484
 
 point as to save Thomas Sparks’s life. For Mr. Sparks to be put to death in the electric chair all 12 of you would have to vote that he be electrocuted. If you cannot reach a decision or if you vote otherwise, |Mhe would receive life imprisonment without benefit of probation, parole and suspension of sentence. We had a case here several years ago where two individuals from Baton Rouge sodomized a young child and killed him. To me that is an electric chair case. With all due respect to police officers, we do not believe that this particular case, the facts of this case warrant that sentence. In your deliberations as to what the punishment will be, you can consider all of the evidence that has been previously introduced. I feel like at this stage that we are talking about more than reasonable doubt. I believe that at this stage we are talking about any doubt, any doubt whatsoever. Once again, I thank each of you. We have been here a long time — thank you so much.
 

 We find this closing argument to be similar to a closing argument this Court considered in
 
 State v. Myles,
 
 389 So.2d 12, 28-29 (La.1980) (on rehearing). In that case, we could not say counsel acted unreasonably in deciding not to present any evidence at the penalty phase.
 
 Id.,
 
 at 30. But having rested his client’s case without evidence, it was even more imperative that defense counsel advocate his client’s case in closing argument.
 
 Id.,
 
 at 31. Where defense counsel did not expressly ask the jury to spare the defendant’s life or directly argue that it should not impose a death sentence,
 
 id.,
 
 at 28, this Court found the advocacy to be tepid and virtually nonexistent.
 
 Id.,
 
 at 30. However, as explained below, we find on this record before us there is insufficient evidence to determine whether counsels’ performance was deficient and therefore, this issue warrants an evidentiary hearing.
 

 Defense counsel did not present witnesses or introduce new evidence at the penalty phase. In evaluating a claim of ineffective assistance of counsel during the penalty phase of a capital case, we first determine whether a reasonable investigation would have uncovered mitigating evidence.
 
 State v. Brooks,
 
 94-2438, p. 7 (La.10/16/95), 661 So.2d 1333, 1337-1338 (on rehearing). If such evidence could have been found, we must consider whether counsel had a tactical reason for failing to put the evidence before the jury.
 
 Id.,
 
 94-2438 at p. 7, 661 So.2d at 1338. If the failure to present mitigating evidence was not a tactical decision but reflects counsel’s failure 1 n5to adequately advocate his client’s cause, defendant must still have suffered actual prejudice before relief will be granted.
 
 Id.
 

 In evaluating counsel’s investigation, the United States Supreme Court has stated “strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.”
 
 Burger v. Kemp,
 
 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (quoting
 
 Strickland,
 
 466 U.S. at 690-691, 104 S.Ct. at 2066). As this Court has stated, “while the failure to
 
 present
 
 mitigating evidence at trial can be reasonable if shown to be the result of tactical decision, the failure to
 
 investigate
 
 the existence of such evidence is ineffective assistance of counsel.”
 
 State ex rel. Busby v. Butler,
 
 538 So.2d 164, 171 (La.1988)(col-lecting eases)(emphasis in original).
 

 On the present record, we cannot tell the extent, if any, of counsel’s investigation for mitigating evidence. From this record we cannot determine the existence, character, and weight of mitigating evidence that might have been
 
 *485
 
 available. Nor can we evaluate counsels’ tactical and strategic decisions in their advocacy on behalf of their client at the penalty phase,
 
 i.e.,
 
 whether the decision to not present any mitigating evidence was a tactical one. Thus, we find it is necessary to remand this case to the trial court for an evidentiary hearing on the issue of effectiveness of counsel at the penalty phase. On the direct review of a death sentence, when there is a substantial allegation of ineffective assistance of counsel in the penalty phase, it is preferable to affirm the sentence but remand the case to the trial court for an evidentiary hearing on ineffective assistance of counsel, with the defendant’s right reserved to seek review.
 
 State v. Hamilton,
 
 92-2639, p. 1 (La.7/1/97), 699 So.2d 29, 35 (Lemmon, J., assigning additional reasons),
 
 cert. denied,
 
 522 U.S. 1124, 118 S.Ct. 1070, 140 L.Ed.2d 129 (1998). In this manner, claims of | ^ineffective assistance of counsel can be cleared up on direct appeal in the state courts so that a clean and complete record will be available for subsequent federal review.
 
 Id.
 
 On several occasions, this Court has pretermitted determination of the validity of a death sentence because of a possibly meritorious claim of ineffective assistance of counsel and has remanded the case to the trial court for an evidentia-ry hearing on the claim.
 
 State v. Strickland,
 
 92-0025, p. 51 (La.11/1/96), 683 So.2d 218, 238-239;
 
 State v. Wille,
 
 559 So.2d 1321, 1339 (La.1990);
 
 State v. Williams,
 
 480 So.2d 721, 727-728 (La.1985);
 
 State v. Fuller,
 
 454 So.2d 119, 124-125 (La.1984).
 

 Therefore the death sentence is conditionally affirmed. The trial court is ordered to hold an expeditious evidentiary hearing on defendant’s claim that he received ineffective assistance of counsel relating to the penalty phase of his capital trial, in order to decide whether defendant received effective assistance of counsel at the penalty phase of the trial. If the trial court concludes that a new penalty hearing is required, the trial court should order one expeditiously. If the trial court determines the claim is without merit, the defendant may again appeal to this Court for review of that decision.
 

 MOTION FOR NEW TRIAL
 

 (Assignment of error 12)
 

 Defendant contends newly discovered evidence, allegedly suppressed at trial, significantly undermined the credibility of Annie Broadway. Additionally, because different judges presided over the trial and motion for new trial, in addition to the wrong standard of review being used by the judge hearing the motion for new trial, defendant contends he was denied due process in the adjudication of his motion for new trial.
 

 The suppression by the prosecution of evidence favorable to the accused after | B7receiving a request for it violates a defendant’s due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecution.
 
 Brady v. Maryland,
 
 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). The
 
 Brady
 
 rule encompasses evidence which impeaches witness testimony when the reliability or credibility of that witness may determine guilt or innocence.
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985);
 
 State v. Knapper,
 
 579 So.2d 956, 959 (La.1991).
 
 Brady
 
 also requires the disclosure of evidence concerning a promise of leniency or immunity to a material witness in exchange for his testimony at trial.
 
 Giglio v. United States,
 
 405 U.S. 150, 154-155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).
 

 Moreover, to the extent exposure of a witness’s motivation is a proper
 
 *486
 
 and important function of the constitutionally protected right of cross-examination, a witness’s “hope of knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest.”
 
 State v. Brady,
 
 381 So.2d 819, 822 (La.1980) (collecting cases);
 
 State v. Vale,
 
 95-577, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. A witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding his conduct.
 
 Vale,
 
 666 So.2d at 1072;
 
 State v. Nash,
 
 475 So.2d 752, 755-756 (La.1985);
 
 see also State v. Bailey,
 
 367 So.2d 368, 371 (La.1979) (When circumstances indicated the witness might have received the impression that testimony favorable to the State would result in dropping of charges against him, defendant was entitled to new trial where information was not revealed.)
 

 Nonetheless,
 
 Brady
 
 and its progeny do not establish a general rule of discoverability. The prosecutor does not violate his constitutional duty of disclosure “unless his omission is of sufficient significance to result in the denial of the | ^defendant’s right to a fair trial.”
 
 United States v. Agurs,
 
 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish “materiality” in the constitutional sense.
 
 Agurs,
 
 427 U.S. at 109-110, 96 S.Ct. at 2400. Establishing the proper standard of materiality, the Court wrote:
 

 [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.
 

 Id.,
 
 427 U.S. at 112-113, 96 S.Ct. at 2402.
 

 For purposes of
 
 Brady’s
 
 due process rule, a reviewing court determining materiality must ascertain “not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.”
 
 Kyles v. Whitley,
 
 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995);
 
 see also State v. Strickland,
 
 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the material to an outcome-determinative test in which it weighs the probabilities that the defendant would have obtained an acquittal at trial or might do so at a second trial. Instead, a
 
 Brady
 
 violation occurs when the “evidentiary suppression ‘undermines confidence in the outcome of the trial.’ ”
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. at 1566 (quoting
 
 Bagley,
 
 473 U.S. at 678, 105 S.Ct. at 3381). In sum,
 
 Brady
 
 analysis requires the movant to satisfy a three-prong test: 1) favorable (impeaching or exculpatory) evidence; 2) that must have been withheld; and 3) prejudice must have been caused thereby.
 
 Strickler v. Greene,
 
 527 U.S. 263, 281-282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).
 

 | ^Turning to defendant’s argument, he alleges the State withheld information regarding the benefits Annie Broadway received in exchange for her testimony and cooperation. Specifically, he alleges Ms. Broadway received benefits in that she faced five counts of theft by fraud against two businesses and the 21st Judicial District Court issued an instanter attachment for her failure to appear on charges of three of those counts, yet she was not arrested. Second, he alleges Ms. Broadway
 
 *487
 
 was arrested as a suspect in the murder of Deputy Toefield, as she was taken away in handcuffs for questioning. Third, although Ms. Broadway was on parole at the time of the offense, her parole was not revoked. Finally, Ms. Broadway later revealed in an unrelated case that she had received a Crime Stoppers reward of $800 for her testimony against defendant.
 

 At trial, the prosecution acknowledged the less than stellar condition of Ms. Broadway’s law-abiding character. In opening statements, the State noted Ms. Broadway was a convicted felon who had recently been paroled at the time of the murder. Ms. Broadway testified she had been convicted in October 1982 of forgery and had served time. She conceded she was on parole at the time of the murder. Defendant’s opening argument also highlighted the general weakness of Ms. Broadway’s credibility. On cross-examination, defendant brought out that Ms. Broadway was likely a fugitive from a conviction in Michigan for writing NSF checks. She said she had received a one-year sentence which she had not served, but she left Michigan. She also testified when she was paroled from federal prison on July 11, 1983, she was told by the authorities she might not be released as the State of Michigan had been notified. However, as there was no response from Michigan, she was released from the federal prison. She also admitted using cocaine and drinking part of two pints of whiskey the night before the murder. And she testified l7nshe had done a lot of drugs during the course of her life, but was not doing as much since being released from federal prison.
 

 Although defendant avers the State failed to disclose that Ms. Broadway faced charges in the 21st Judicial District Court for writing NSF checks or that she was wanted on a bench warrant, there is little to demonstrate this was a conscious choice by the prosecution. At the hearing on the motion for new trial, Duncan Kemp, who was the District Attorney from 1979 through 1996, testified he was not aware of the pending bad-check charges. Nor was it unusual the instanter subpoena for her arrest was not served because the Sheriffs office did not do a very good job of picking up people on attachments and warrants. Nor was it unusual to dismiss the charges for the two checks for which Ms. Broadway made restitution. That was the structure of the “bad check program” in the District Attorney’s office. ADA William Quin, who also prosecuted the defendant, was similarly unaware of any pending NSF check charges.
 

 However, because the District Attorney’s office is charged with knowledge available to all acting on the State’s behalf in the case,
 
 Strickler,
 
 527 U.S. at 281, 119 S.Ct. at 1948, he has the duty to timely disclose “favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case.”
 
 State v. Kemp,
 
 2000-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. Here, whether or not the prosecutors knew about the pending charges and attachment, this still constituted impeachment evidence regarding Ms. Broadway’s credibility and motivation to cooperate with the State. Thus, defendant has satisfied the first
 
 Strickler
 
 factor requiring the evidence have impeachment value.
 

 However, even if this information constituted impeachment evidence, nothing presented reaches the level of materiality required by
 
 Brady
 
 and
 
 Strickler.
 
 Defendant |71 freely confessed to the murder, an independent eyewitness, Mr. Harper, testified to seeing the defendant commit the murder, and the State did present Ms. Broadway as a less than wholly credible witness. During cross-examination,
 
 *488
 
 Ms. Broadway herself revealed she was likely a fugitive from Michigan. Nothing defendant presents here, even if impeaching of Ms. Broadway’s credibility but withheld, reaches the touchstone of materiality: a “reasonable probability” of a different result.
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. at 1566. In the absence of this evidence, defendant still received a trial resulting in a verdict worthy of confidence.
 

 Defendant alleges Ms. Broadway was arrested and the police considered her a suspect. He claims the police entertained charging her with accessory after the fact and the State should have revealed the threat of prosecution. However, evidence adduced at the hearing does not support this allegation. Investigating officers and Mr. Kemp testified Ms. Broadway was never really considered a suspect and thus was never charged with murder or accessory after the fact. Deputy Willie Johnson testified he could not recall any discussion of charging Ms. Broadway with any crime. Deputy Larry Westmoreland testified he took Ms. Broadway’s statement. He advised Ms. Broadway of her rights before he took her statement, but it was “pretty much” his practice to advise everyone of their rights, even witnesses. After he read her rights to her, he specifically told her she was not under arrest. Deputy Westmoreland believed she was detained by Deputy Kerry Dangerfield, not under arrest by him. Deputy Dangerfield did testify Ms. Broadway was treated as being part of what happened. He believed it was Chief Deputy Johnson’s decision not to charge Ms. Broadway as an accessory. Defendant contends the arrest conflicted with Ms. Broadway’s trial testimony that she fled from Hi Ho Sam’s and soon thereafter contacted the police. He argues due process required the State to reveal the threat to |72prosecute Ms. Broadway as an accessory.
 

 However, at the hearing on the motion for new trial, the testimony from law enforcement was consistent that no charges were contemplated against Ms. Broadway, nor did they run her “rap sheet.” Assuming
 
 arguendo
 
 the handcuffing and detention of Ms. Broadway was an arrest,
 
 [19]
 
 nonetheless the nondisclosure does not rise to the level of materiality necessary to establish prejudice sufficient to undermine confidence in the outcome of the trial.
 
 Kyles,
 
 514 U.S. at 434,
 
 115
 
 S.Ct. at 1566;
 
 Agurs,
 
 427 U.S. at 112-113, 96 S.Ct. at 2402.
 

 Defendant also alleges Ms. Broadway had every incentive to cooperate with the authorities because she was vulnerable to reincarceration as a parole violator at the time of the murder. He argues due process required the State to reveal the threat to Ms. Broadway of revocation of her parole. We find no merit to this argument. It is quite clear from the trial transcript that Ms. Broadway’s status of a parolee at the time of the murder was not kept from the defendant. Moreover, she was violating terms of her parole in his presence by using cocaine, riding in a car which he said was stolen and knowing he had a gun. Although in brief defendant argues “due process required the State to reveal the threat to Ms. Broadway of revocation of her probation,” there is nothing to support defendant’s allegation Ms. Broadway was ever threatened with revocation, much less in order to induce cooperation. The only testimony at the hearing on the motion for new trial to support such an allegation
 
 *489
 
 came from testimony regarding a conversation between defendant’s counsel, Ms. Lila Tritico-Hogan, and Ms. Broadway’s parole officer, Gordon Gsell. The court sustained the State’s hearsay objection but permitted the proffer of this testimony. 17SEven if we were to set aside the obvious hearsay issues surrounding a lawyer reading from her notes of a conversation with an out-of-court witness, nothing concrete was presented to demonstrate there was a negotiated deal between the State and Mr. Gsell to not revoke Ms. Broadway’s parole.
 

 In a conversation on June 13, 1988, Mr. Gsell allegedly told Ms. Hogan that he chose not to revoke Ms. Broadway despite her violating the terms of her parole, but he would have if the Tangipahoa Parish Sheriffs Office had filed charges against her. Mr. Gsell allegedly told Ms. Hogan he had a conversation with Deputy Johnson wherein Deputy Johnson stated if Ms. Broadway changed her testimony the Sheriffs Office would try to charge her with being an accessory to murder. In connection with Ms. Hogan’s testimony, defense was allowed to proffer an exhibit of purported notes made by Mr. Gsell on February 14, 1984. Ms. Hogan also testified Mr. Gsell stated there was “no pressure” on him not to revoke Ms. Broadway’s parole. Nor was there any discussion with the District Attorney’s office of any benefits, rewards or promises to Ms. Broadway in exchange for her testimony.
 

 Mr. Kemp testified he did not have a conversation with Mr. Gsell or any law enforcement officers about revoking Ms. Broadway’s parole. Deputy Johnson did not remember his conversation with Mr. Gsell, but it would have been just conversation. He never discussed Ms. Broadway’s parole status with her.
 

 In this record, we cannot find evidence that Ms. Broadway was offered continued parole in exchange for her testimony or that she was even threatened with revocation if she failed to cooperate. Notably, in his reasons for judgment, the judge did not consider the proffered testimony or proffered exhibit. There was nothing for the State to reveal regarding Ms. Broadway’s parole; this argument is meritless.
 

 Finally, defendant avers Ms. Broadway was promised a reward for her 174testimony. Again, this evidence came from the proffered testimony of Ms. Hogan. The court allowed the proffer of a deposition from a civil case in Florida in which Ms. Broadway was seeking to collect a reward for turning her son in for murder. In that deposition, Ms. Broadway stated she received a $300 reward from Crime Stoppers in connection with the prosecution of Thomas Sparks. However, the overwhelming testimony at the hearing showed the notion that Ms. Broadway was paid any reward was dubious at best. Major Chester Pritchett, who administered the Crime Stoppers program, had no knowledge or record of a reward to Ms. Broadway. He did note his records went back only to 1985. Deputy Johnson, Detectives Rackey and Dangerfield, and both prosecutors all testified they had no knowledge of Ms. Broadway receiving any reward. Defendant fails to demonstrate Ms. Broadway actually received a reward or that law enforcement and the prosecution had any knowledge of Ms. Broadway receiving any reward.
 

 We find defendant fails to establish any
 
 Brady
 
 violation resulting in a verdict unworthy of confidence. Although the pending NSF check charges, the instanter subpoena and her possible arrest the day of the murder meet the first prong of
 
 Striclc-ler,
 
 this omitted evidence does not create a reasonable doubt. There is no evidence to support defendant’s allegations that Ms. Broadway received any benefits related to her parole or received reward money.
 

 
 *490
 
 In the second component of this assignment of error, defendant avers because his motion for new trial was presided over by a judge who did not preside over the trial, the court fell into error as it could not properly weigh the evidence at the hearing against the evidence adduced at trial. Defendant avers Louisiana law requires the same judge who presided at trial to preside over any motion for new trial. Judge Kenneth J. Fogg presided over defendant’s trial. Judge Fogg took a seatl7fion the Louisiana First Circuit Court of Appeal in 1993. His successor at the 21st Judicial District Court, Judge Chutz, was recused because he had served as an assistant district attorney on the case. Thus, the hearing on the motion for new trial was heard by Judge Robert H. Morrison, III. Defendant seizes upon a minor factual error in Judge Morrison’s written reasons for judgment to support his claim that the judge’s description of the evidence contains critical errors. In the written reasons, the judge stated Mr. Quin testified Ms. Broadway’s evidence was corroborated by other evidence, including defendant’s fingerprints on the victim’s police unit. Mr. Quin actually testified defendant’s fingerprints were on the car next to Deputy Toefield’s police unit, which is an accurate characterization of the trial testimony. This minor error in the reasons for judgment denying the motion for new trial does not demonstrate critical errors by the judge.
 

 In Louisiana, the practice of substituting judges to hear motions for new trial is confined solely to cases of necessity.
 
 State v. Henderson,
 
 243 La. 233, 241, 142 So.2d 407, 409 (1962),
 
 cert. denied sub nom Henderson v. Louisiana,
 
 371 U.S. 942, 83 S.Ct. 324, 9 L.Ed.2d 276 (1962). Substitution after verdict is never permitted “except under unavoidable circumstances, such as sickness, impossibility to act, or other substantial cause which would make the continuance of the trial judge’s presence impossible.”
 
 Id.,
 
 142 So.2d at 410
 
 (quoting Commonwealth v. Thompson,
 
 328 Pa. 27, 195 A. 115, 114 A.L.R. 432 (1937)). The fact Judge Fogg was no longer a judge at the district court satisfies the definition of an unavoidable circumstance making it impossible for him to preside over the motion for new trial. This argument has no merit.
 

 In the final component of this assignment of error, defendant argues the court applied the wrong standard of review in ruling on the motion for new trial. In written reasons, the court did not apply the legal standard of materiality for purpose of
 
 17f,Brady’s
 
 due process rule: whether in the absence of the evidence the defendant received a trial resulting in a verdict worthy of confidence.
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. at 1566. Rather, the court applied the outcome determinative test for granting new trials on newly discovered evidence — “not simply whether another jury might bring in a different verdict, but whether the new evidence is so material that it
 
 ought
 
 to produce a verdict different from that rendered at trial.”
 
 State v. Clayton, 427
 
 So.2d 827, 832 (La.1982). However, it is hard to find error when the court applied the standard called for by La.Code Crim. Proc. art. 851(3), the statute under which defendant filed his motion for new trial. Moreover, it is clear the defendant did not satisfy the lesser, non-outcome determinative
 
 Kyles
 
 standard of materiality.
 

 For all of the reasons expressed above, this assignment of error lacks merit.
 

 Delay Between Verdict and Direct Appeal
 

 (Assignment of error 16)
 

 Defendant contends the delay between the jury’s verdict and the direct
 
 *491
 
 appeal of his conviction and sentence violates his constitutional rights. This argument has two components. First, defendant contends executing him after twenty-three years on death row constitutes cruel and unusual punishment. Second, he avers the delay violates his right to due process and a speedy trial.
 

 Before addressing these legal arguments, we will first briefly review the post-conviction procedural history of this case. The appeal was filed and the record lodged with this Court on January 5, 1988. This Court then granted defendant’s writ and remanded the case to the trial court to rule on defendant’s motion for new trial.
 
 El-Mumit v. Twenty-First Judicial Dist. Court,
 
 500 So.2d 414, 415 (La.1987). After a hearing on April 1, 1987, the trial court denied the motion for new trial. Newly obtained defense counsel, Ms. Lila Tritico Hogan, averred it was discovered in June, |771988, that Ms. Broadway was threatened with prosecution in order to obtain her testimony, was given immunity in exchange for her testimony, and was promised a reward for her cooperation. Defendant filed a motion for new trial and stay of appeal with this Court on October 12, 1988. On October 13, 1988, this Court stayed the appeal and ordered the case remanded to the trial court for a hearing on the motion for new trial.
 

 However, the hearing was delayed for many years, primarily because the defendant was litigating with the United States Department of Justice regarding the state court subpoena of United States Probation Officer Gsell and United States Probation Office files on Annie Broadway. This case was removed to federal court; eventually the subpoenas were quashed and the case dismissed on sovereign immunity grounds.
 
 State v. Sparks,
 
 978 F.2d 226, 236 (5th Cir.1992). In that decision, the court observed defendant was not precluded from pursuing administrative remedies.
 
 Id.,
 
 n. 18. This pursuit came to an end in 1998.
 
 See El-Mumit v. United States Parole Comm’n,
 
 No. 96-1524 (D.D.C.1998).
 

 During this period of protracted litigation over Ms. Broadway’s parole records, on October 2, 1996, the Clerk of this Court addressed a letter to Judge Wayne Chutz, who had replaced Judge Kenneth Fogg at the district court, inquiring about the status of the new trial motion. This letter specifically advised “[t]he record in this matter should be supplemented with whatever action has taken place. If no action has taken place, please advise as to when it can be expected.” In a letter dated October 28, 1996, Judge Chutz responded that defendant’s counsel was still pursuing information from federal authorities and that a hearing on the motion for new trial would be scheduled once the United States District Court for the District of Columbia ruled.
 

 The hearing on the motion for new trial was held on September 14, October 29, 178and December 10, 1999. The trial court denied the motion on April 20, 2000. Inexplicably, despite the letter from the Clerk of the Louisiana Supreme Court, this Court was not notified by the district court that the motion for new trial had been denied. There is absolutely no record in this Court of any notice received from Judge Morrison that the motion for new trial had been denied. Defendant took no affirmative steps to revive the appeal until he filed directly in this Court another motion for new trial on the basis of claimed inaccuracies in the trial transcript. Because he had not filed in the trial court, we transferred the application to the trial court for it to rule.
 
 State v. El-Mumit,
 
 08-1114 (La.6/20/08).
 

 The trial court denied this motion on August 5, 2008, and ordered the defendant to perfect his appeal in sixty days. In a
 
 *492
 
 per curiam, the trial court expressed dismay that the case had never been appealed after the motion for new trial was denied in 2000. Part of the district court’s confusion may have stemmed from that court’s belief, as expressed in the per curiam, that this Court denied a writ on the 2000 ruling denying the motion for new trial “on August 16, 2002 (2001-KH-2665).” However, that writ application did not raise any issues regarding the merits of the new trial motion.
 

 In brief to this Court, defendant now argues if any death row inmate is ever to obtain relief on the grounds that too much time has passed between his conviction and the time at which the State seeks to execute him, he should obtain relief. This has come to be known as a
 
 Lackey
 
 claim.
 
 Bieghler v. State,
 
 839 N.E.2d 691, 697 (Ind. 2005),
 
 cert. denied,
 
 546 U.S. 1159, 126 S.Ct. 1190, 163 L.Ed.2d 1144 (2006);
 
 State v. Moore,
 
 256 Neb. 553, 591 N.W.2d 86, 93 (1999),
 
 cert. denied sub nom Knight v. Florida,
 
 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999). In
 
 Lackey v. Texas,
 
 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Stevens, J., statement | ^respecting denial of certiorari), Justice Stevens found there was foundational support to petitioner’s contention that execution after 17 years on death row violates the Eighth Amendment’s prohibition against cruel and unusual punishment. Justice Stevens agreed that the importance and novelty of the question was ideal for further study in the lower courts before being addressed by the nation’s highest court.
 
 Id.
 
 In
 
 Johnson v. Bredesen,
 
 — U.S. -, 130 S.Ct. 541, 542, 175 L.Ed.2d 552 (2009) (Stevens, J., statement respecting denial of certiorari), he declared his “strongly held view that state-caused delay in state-sponsored killings can be unacceptably cruel.”
 
 See also Knight v. Florida,
 
 528 U.S. 990, 120 S.Ct. 459, 461, 145 L.Ed.2d 370 (1999) (Breyer, J., dissenting from denial of certiorari) (“Where a delay, measured in decades, reflects the State’s own failure to comply with the Constitution’s demands, the claim that time has rendered the execution inhuman is a particularly strong one.”) Defendant avers he has not “availed] himself of the panoply of appellate and collateral procedures and then complainfed] when his execution is delayed.”
 
 Johnson,
 
 130 S.Ct. at 544 (Thomas, J., concurring in denial of certio-rari). We disagree.
 

 Much of the delay in the direct appeal is clearly attributable to the defendant.
 
 See Lackey,
 
 115 S.Ct. at 1422 (Stevens, J.) (There may be constitutional significance to the reasons for various delays and it may be appropriate to distinguish “among delays resulting from (a) a petitioner’s abuse of the judicial system by escape or repetitive, frivolous filings; (b) a petitioner’s legitimate exercise of his right to review; and (c) negligence or deliberate action by the State.”) Although this case had been pending for twenty-three years before defendant perfected his appeal in this Court, much of that delay was attributable to defendant’s litigation in multiple jurisdictions of issues in his motion for new trial, including the motion itself. In |snaddition, defendant had done nothing after the denial of his motion for new trial in 2000 to further his appeal, while simultaneously filing numerous civil lawsuits against the Louisiana Department of Public Safety and Corrections. Thus, his argument contending the length of time on death row violates the Eighth Amendment rings hollow.
 

 The long delays that are the hallmark of capital litigation do not present an independent Eighth Amendment claim.
 
 See Johnson,
 
 (Thomas, J.), 130 S.Ct. at 544 (unaware of any constitutional support for the novel argument that delay
 
 *493
 
 on death row is cruel and unusual punishment). Other jurisdictions have considered the Eighth Amendment claim that long confinement on death row constitutes cruel and unusual punishment and have soundly rejected such claims.
 
 State v. Moore,
 
 256 Neb. 553, 591 N.W.2d 86, 93 (1999),
 
 cert. denied,
 
 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (collecting cases). The Nebraska Supreme Court’s finding that Moore had not claimed the State set up a scheme to prolong the period of his incarceration [or litigated the motion for new trial] in order to torment him is equally applicable here.
 
 Id.
 
 at 94. Although a prisoner should not be penalized for pursuing review of the conviction or sentence, he also should not be able to avoid a lawful sentence by the mere passage of time.
 
 Bieghler v. State,
 
 839 N.E.2d 691, 697 (Ind.2005),
 
 cert. denied,
 
 546 U.S. 1159, 126 S.Ct. 1190, 163 L.Ed.2d 1144 (2006). The value of speed should not trump the value of accuracy.
 
 Id.
 
 Although defendant points to several dissents in certiorari denials from two Justices of the United States Supreme Court, he cites no binding or even persuasive jurisprudence in support of this argument.
 

 Defendant additionally argues the delay violated his due process right to a speedy trial. The federal Fifth Circuit Court of Appeals has recognized that a state could violate due process if it substantially delayed the appellate process it provided Rifor convicted criminal defendants.
 
 Rheuark v. Shaw,
 
 628 F.2d 297, 302 (5th Cir.1980),
 
 cert. denied,
 
 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981). Courts considering whether inordinate delay in the appeals process constitutes a violation of due process should be predominantly concerned with whether the defendant was prejudiced.
 
 State v. Chappie,
 
 135 Ariz. 281, 660 P.2d 1208, 1225-1226 (1983). In deciding this issue, some courts focus on the similarities between a defendant’s interest in a speedy trial and his interest in a speedy appeal and apply the four-factor test balancing test developed for speedy trial violations.
 
 United States v. Bermea,
 
 30 F.3d 1539, 1569 (5th Cir.1994).
 
 [20]
 
 Defendant contends under any analysis, he was substantially prejudiced by the delay. In evaluating the prejudice to the defendant in the appellate context, the court focuses upon: (1) oppressive incarceration pending appeal, (2) the anxiety and concern of the convicted person awaiting the outcome, and (3) impairment of the convicted person’s grounds for appeal or the viability of his defense in the event of retrial.
 
 Id.
 
 Defendant avers he meets all of these factors, and particularly is unable to press claims in the same manner he could have pressed them had he received a reasonably timely appeal.
 

 We have long held the constitutional right to a speedy trial, guaranteed by the Sixth Amendment to the United States Constitution and La. Const, art. I, § 16 (1974), does not extend to the appellate stage.
 
 State v. Johnson,
 
 363 So.2d 458, 460 (La.1978);
 
 State v. Lane,
 
 302 So.2d 880, 887-888 (La.1974). Thus, defendant’s right to due process has not been compromised. Defendant correctly observes that some courts have recognized due process can be denied by substantial retardation of the appellate process. Nonetheless, even if an unreasonable delay could conceivably | ^prejudice a defendant’s right to a proper review of his claims, this defendant has done nothing to show how delay prejudiced
 
 *494
 
 his appeal. Moreover, defendant bears a significant portion of the responsibility for the delay; there is no evidence in this record, nor does defendant attempt to argue, that he asserted his right to appeal after the denial of his motion for new trial in 2000. Accordingly, when taken in context of the defendant’s conduct, or lack thereof, the complained of delays not attributable to the defendant or the Federal government are not unreasonable.
 
 Cf. Mims v. LeBlanc,
 
 176 F.3d 280, 282-283 (5th Cir.1999) (assuming that appellate delays could violate constitutional guarantees but noting that “ongoing delay” in case under review, though “unfortunate,” remained “insufficient to qualify as a due process violation.”) This assignment of error is without merit.
 

 CAPITAL SENTENCE REVIEW
 

 Under La.Code Crim. PROC. art. 905.9 and La. S.Ct. Rule 28, we review every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
 

 The district judge has filed the Uniform Capital Sentence Report (“UCSR”) required by La. S.Ct. Rule 28 § 3(a) and the Department of Public Safety and Corrections submitted a PreSentence Investigation Report (“PSI”).
 
 See
 
 La. S.Ct. Rule 28 § 3(b). In addition, the State and the defense have filed sentence review memo-randa.
 

 Those documents show defendant, an African-American male, was 33 at the | satime of the offense. Married with three children, defendant himself was an only child. He was born to the legal union of Thomas Sparks and Gloria Perry in New Orleans, Louisiana. His parents were separated when his father was sentenced to the Louisiana State Penitentiary in 1951. Defendant has never seen his father. He completed his GED and some college course work while in Federal incarceration and was of “high” intelligence. Psychiatric evaluations found he was able to distinguish right from wrong, and able to cooperate intelligently in his own defense. The evaluating psychiatrist found defendant “clever, cunning, and manipulative,” and ascertained he suffers from “severe antisocial personality disorder.” The PSI noted from the psychiatrist’s report that defendant’s character disorder traits were consistent with a severe anti-social personality disorder, such as: chronic truancy, chronic childhood theft, chronic lying, cruelty to animals, chronic crying, chronic drug abuse, and very poor impulse control.
 

 Defendant was unemployed at the time of the murder, holding intermittent employment for the brief periods that he was not incarcerated. At age 18, defendant joined the United States Marine Corps, leaving under a general discharge under honorable conditions. During his service, he twice went AWOL and was confined to hard labor for three months as a result. Defendant claimed he spent several months at Camp Pendleton California Naval Hospital because of several bad trips with LSD. He abused amphetamines and barbiturates while in the Marines. He almost overdosed while on leave, and again in Orleans Parish prison while being held on charges of indecent behavior with a juvenile. He stopped drug use for nine years, but began using marijuana and speed while in Federal prison. After release, he used marijuana and alcohol.
 

 
 *495
 
 Defendant had several encounters with the criminal justice system during his | ^youth. He was “known” to the New Orleans Juvenile Probation Department on 4/30/64 for malicious mischief, 9/6/64 for threats, and 5/27/65 for dangerous weapon and simple burglary. He was paroled to his mother’s home on 1/16/66 from the “State Industrial School for Colored Boys.” He was recommitted on 3/11/66 for sodomy of a young boy.
 

 Defendant also possessed a lengthy adult criminal history before the events that led to his current imprisonment and death sentence. Defendant had arrests/convictions for: (1) Glue sniffing (6/30/67); (2) Simple kidnapping (3/24/68, but expunged); (3) Carrying of a concealed weapon (7/6/69); (4) Indecent behavior with a juvenile (7/6/69); (5) Two counts of bank robbery (10/28/70, defendant stole upwards of $13,000 from two New Orleans banks, and during one robbery held a gun to the head of a 10-year-old boy); (6) Driving on shoulder (9/11/83); (7) Assault on a Federal corrections officer (8/14/80, defendant punched a corrections officer in the head after a disagreement); and (8) Aggravated rape (1/28/84, defendant alleged to have raped his 13-year-old daughter at gunpoint, but the St. Landry Parish District Attorney dropped the charges after the instant conviction). Defendant was convicted in Orleans Parish for a bank robbery which occurred on February 1, 1984, in the New Orleans branch of the American Bank and Trust Company, and which preceded the instant murder by one day, but the United States Attorney dropped the federal charges to allow the state to proceed with the first-degree murder prosecution. This conviction and sentence for the American Bank and Trust robbery was affirmed several months before trial in the present case.
 
 State v. Sparks,
 
 483 So.2d 1246 (La.Ct.App. 4 Cir.1986).
 

 Passion, Prejudice, and other Arbitrary Factors
 

 The first-degree murder of Deputy Edward Toefield occurred on February 2, 1^1984, and following jury selection, trial commenced on August 14, 1986, and lasted four days. The victim, an African-American male, was 41 years of age at the time of his death. Defendant, an African-American male, was 33 years old at the time of this offense. Although defendant alleges the State unconstitutionally secured an all-Caucasian jury by exercising peremptory challenges to strike African-Americans solely on the basis of race, this was addressed in the text of this opinion and found to be without merit.
 

 Citing pre-trial publicity, the defendant filed a motion to change venue. The State stipulated to moving the trial to adjacent Livingston Parish. Defendant filed a second motion to change venue, alleging pervasive pre-trial publicity necessitated a change in venue. This second motion was denied. Defendant’s allegation that the court erred in denying his second motion for change of venue because of pervasive publicity and extraordinary security was addressed in the text of this opinion and found to be without merit.
 

 The record does not show any indicia of arbitrariness.
 

 Aggravating Circumstances
 

 The State relied on one aggravating circumstance under La.Code CRIM. Proc. art. 905.4, and the jury returned the verdict of death, finding the circumstance was supported by the evidence that the victim was a peace officer engaged in his lawful duties. La.Code Crim. Proc. art. 905.4(a) (West 1984). The aggravating circumstance was uncontroverted and fully supported by the evidence. Consequently, the defendant’s sentence of death is firmly grounded.
 

 
 *496
 

 Proportionality
 

 Although the federal Constitution does not require proportionality review,
 
 Pulley v. Harris,
 
 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of | Sñexcessiveness in Louisiana.
 
 State v. Burrell,
 
 561 So.2d 692, 710 (La.1990),
 
 cert. denied,
 
 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991);
 
 State v. Wille,
 
 559 So.2d 1321, 1341 (La.1990);
 
 State v. Thompson,
 
 516 So.2d 349, 357 (La.1987),
 
 cert. denied,
 
 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case,
 
 inter alia,
 
 a sufficiently “large number of persuasive mitigating factors.”
 
 State v. Sonnier,
 
 380 So.2d 1, 9 (La.1979);
 
 see also State v. Weiland,
 
 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
 

 We review death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
 
 Sonnier,
 
 380 So.2d at 7. The manner in which this Court conducts this aspect of Rule 28 review has been challenged in the United States Supreme Court and found not to present a significant federal question.
 
 Holmes v. Louisiana,
 
 — U.S. -, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009)(cert.denied).
 

 The State’s Sentence Review Memorandum reveals that since 1976, 20 cases have originated as first-degree murder charges in the 21st Judicial District Court, Livingston Parish. Of those, juries have recommended the death penalty for four defendants.
 

 The first, George Brooks, participated with his co-defendant James Copeland in the repeated rape and eventual murder of an 11-year-old boy. After initially remanding his case to the trial court for a hearing on a motion for a new trial, this Court affirmed Brooks’s conviction and sentence on direct appeal.
 
 State v. Brooks,
 
 505 So.2d 714 (La.1987),
 
 cert. denied,
 
 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). However, in post-conviction proceedings, we granted Brooks a retrial of the penalty phase on grounds that he had received ineffective assistance of counsel at the penalty stage of his trial.
 
 State v. Brooks,
 
 94-2438 (La.10/16/95), 661 So.2d 1333. The disposition of this case on remand remains unknown.
 

 As for Copeland, he was tried and convicted in Tangipahoa Parish, also a part of the 21st Judicial District, and sentenced to death. Copeland’s first appeal to this Court resulted in reversal of his conviction and sentence.
 
 State v. Copeland,
 
 419 So.2d 899 (La.1982). Following retrial, Copeland was again convicted of first-degree murder and sentenced to death. On appeal, this Court affirmed both the conviction and sentence.
 
 State v. Copeland,
 
 530 So.2d 526 (La.1988),
 
 cert. denied,
 
 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).
 

 The third defendant, Gerald Bordelon, kidnaped, raped, and murdered his 12 year-old stepdaughter. Bordelon had been convicted of three prior violent sexual offenses against women. The jury found him guilty of first-degree murder, and Bordelon instructed his counsel to not pursue any appeals or post-conviction relief. This Court upheld the conviction,
 
 State v. Bordelon,
 
 07-0525 (La.10/16/09), 33 So.3d
 
 *497
 
 842, and defendant was executed soon thereafter.
 

 The fourth defendant, Michael Weary, along with several co-defendants, brutally murdered a classmate after he delivered pizza at a nearby residence. The jury found him guilty of first-degree murder and the court sentenced him to death on April 17, 2002. This Court affirmed his conviction and sentence.
 
 State v. Weary,
 
 03-3067 (La.4/24/06), 931 So.2d 297.
 

 Thus, of the four death sentences meted out by juries in the 21st Judicial District, none of them involved a peace officer. Here, then, it is also appropriate for Isathis Court to look beyond the 21st JDC and conduct the proportionality review on a statewide basis.
 
 Cf. State v. Davis,
 
 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31,
 
 cert. denied,
 
 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). There are at least nine cases in which this Court has affirmed capital sentences based primarily on the jury’s finding that the defendant killed a peace officer.
 
 State v. Williams,
 
 07-1407 (La.10/20/09), 22 So.3d 867 (defendant murdered off-duty police officer working security detail at a Baton Rouge Wal-mart);
 
 State v. Frank,
 
 99-0553 (La.5/22/07), 957 So.2d 724 (robbed restaurant with Rogers LaCaze, where off-duty police officer, and several others, were killed);
 
 State v. LaCaze,
 
 99-0584 (La.1/25/02), 824 So.2d 1063 (robbed restaurant with Antoinette Frank and murdered off-duty police officer working security detail),
 
 cert. denied,
 
 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002);
 
 State v. Broadway,
 
 96-2659 (La.10/19/998), 753 So.2d 801 (defendants shot and killed off-duty police officer escorting a store manager on way to make bank deposit)
 
 cert. denied,
 
 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000);
 
 State v. Brumfield,
 
 96-2659 (La.10/19/99), 753 So.2d 801 (companion case to
 
 Broadway); State v. Felde,
 
 422 So.2d 370 (La.1982) (after being arrested and transported to jail, defendant shot and killed police officer during an escape attempt),
 
 cert. denied,
 
 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983);
 
 State v. Berry,
 
 391 So.2d 406 (La.1980) (while robbing bank, defendant shot and killed a Jefferson Parish Sheriffs Deputy working a paid security detail),
 
 cert. denied,
 
 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981);
 
 State v. Prejean,
 
 379 So.2d 240 (La.1979) (shot and killed an officer conducting a traffic stop);
 
 State v. Washington,
 
 321 So.2d 763 (La.1975) (officer dispatched to a disturbance call was shot in the back by defendant, who removed the officer’s revolver out of its holster). However, as to this last case, the death penalty was subsequently vacated,
 
 Washington v. Louisiana,
 
 428 U.S. 906, 96 S.Ct. 3214, 49 L.Ed.2d 1213 (1976), and defendant was resentenced to life imprisonment at hard labor without benefit of parole for 20 years.
 
 State v. Washington,
 
 348 So.2d 1251 (La.1976).
 

 In defendant’s Sentence Review Memorandum, counsel forcefully challenges the manner in which this Court conducts Rule 28 proportionality and argues that other similar first-degree murder prosecutions arising out of the killing of police officers attempting to make arrests in the line of duty resulted in less than death sentences, either because the jury deadlocked on penalty,
 
 see, e.g., State v. Jones,
 
 99-1185 (La. Ct.App. 5th Cir.9/22/01), 769 So.2d 708;
 
 State v. Bender,
 
 598 So.2d 629 (La.Ct.App. 3rd Cir.1992), or because the jury imposed less than a life sentence.
 
 See, e.g., State v. Marse,
 
 365 So.2d 1319 (La.1978)(man-slaughter verdict returned). Counsel also contrasts defendant’s case with the ostensibly similar crime involved in
 
 Broadway
 
 and
 
 Brumfield
 
 by pointing out that defendant shot Officer Toefield in a panicked attempt to escape capture (exactly the
 
 *498
 
 point argued by the defense in closing at the penalty phase and rejected by jurors) while the defendants in the Baton Rouge crime killed the off-duty police officer working a security detail in furtherance of their plan to commit a robbery.
 

 More broadly, counsel notes that according to F.B.I. statistics, between 1987 to 2009, 50 law enforcement officers were feloniously killed in the line of duty in Louisiana, but the State’s Sentence Review Memorandum lists only a total of eight murder cases across the state in a similar time frame that resulted in death sentences. Beyond extrapolation from the F.B.I. data and the information provided in the State’s Sentence Review Memorandum, defendant lists 11 published decisions arising out of the death of a police officer that did not result in a still — valid death sentence.
 

 Thus, defendant claims he has fallen into the distinct minority of offenders who | cinhave killed police officers and received the death penalty, principally as a result, in his view, of the failure of Louisiana’s capital sentencing scheme to protect against the arbitrary and capricious infliction of capital punishment. Given the systemic failures, he argues that,
 
 Pulley v. Harris,
 
 notwithstanding, the Eighth Amendment requires proportionality review, and requires more of this Court than simply comparing against each other cases that have resulted in the death penalty, as opposed to a systematic comparison with all other similar first-degree murder prosecutions which did not result in a capital sentence.
 
 Cf. Walker v. Georgia,
 
 — U.S. -, 129 S.Ct. 453, 455-56, 172 L.Ed.2d 344 (Stevens, J., dissenting from denial of certiorari)(“Rather than perform a thorough proportionality review to mitigate the heightened risks of arbitrariness and discrimination in this case, the Georgia Supreme Court carried out an utterly perfunctory review.... Had the Georgia Supreme Court looked outside the universe of cases in which the jury imposed a death sentence, it would have found numerous cases involving offenses very similar to petitioner’s in which the jury imposed a sentence of life imprisonment.... If the Georgia Supreme Court had expanded its inquiry still further, it would have discovered many similar cases in which the State did not even seek death.”)
 

 However, in the present case, with the exception of
 
 State v. Washington,
 
 the pool of death sentence cases across Louisiana involving the murder of a police officer is reliable. As noted by this Court in
 
 State v. Bordelon,
 
 07-0525, p. 42 (La.10/16/09), 33 So.3d 842, 868, “comparative proportionality review does not require uniformly consistent results which are not possible in any system that counts on juries to make individualized decisions-Proportionality review serves as another aid to this Court in identifying the truly aberrant case in which, despite the channeling of the jury’s sentencing discretion, the verdict appears nothing more than the “wanton and laifreakish’ imposition of capital punishment akin to the strike of lightening.” (quoting
 
 Furman v. Georgia,
 
 408 U.S. 238, 92 S.Ct. 2726, 2762-2763, 33 L.Ed.2d 346 (1972)) (Stewart, J., concurring). Despite defendant’s challenge to the systemic underpinnings of capital punishment in Louisiana, the United States Supreme Court has specifically upheld this State’s capital sentencing procedures under the Eighth Amendment.
 
 Lowenfield v. Phelps,
 
 484 U.S. 231, 246, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988) (“There is no question but that the Louisiana scheme narrows the class of death-eligible murders and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.”)
 

 
 *499
 
 While the pool of similar death cases might be relatively small when compared with the pool of similar cases which did not result in death, it is large enough that defendant’s sentence does not appear truly aberrant and disproportionate. Defendant placed himself within the narrow class of death-eligible offenders in Louisiana by gunning down Deputy Toefield. Defendant offered the jury the full opportunity to consider a mitigating circumstance,
 
 ie.,
 
 that he shot Deputy Toefield in a blind panic to avoid capture and not with deliberation in the course of committing a premeditated felony offense. Jurors rejected this as a basis for imposing a sentence less than death, perhaps because, as the State emphasized in the penalty phase argument, “when Toefield was obviously incapacitated and slowly falling to the ground, his knees ... buckling,” defendant “cooly and coldly fired two more shots, one into his face below his left eye and one into the right temple.” The jury’s verdict appears far more to be the individualized moral response of the community to the crime than a wanton and freakish imposition of capital punishment. It cannot be said the death sentence in this case is disproportionate.
 

 | ^DECREE
 

 For the reasons assigned herein, the defendant’s conviction is affirmed. However, the sentence of death is conditionally affirmed. A final determination of the appeal is pretermitted. The case is remanded to the trial court for an expeditious evidentiary hearing on defendant’s claim that he received ineffective assistance of counsel relating to the penalty phase of his capital trial, in order to decide whether defendant received effective assistance of counsel at the penalty phase of the trial. If the trial court concludes that a new penalty hearing is required, the trial court should order one expeditiously. If the trial court determines the claim is without merit, the defendant may again appeal to this Court for review of that decision.
 

 FIRST-DEGREE MURDER CONVICTION AFFIRMED; DEATH SENTENCE CONDITIONALLY AFFIRMED; REMANDED TO THE DISTRICT COURT FOR EXPEDITIOUS EVIDENTIARY HEARING.
 

 [1]
 

 . Defendant's application to legally change his name to Abdullah Hakim El-Mumit was granted in
 
 Sparks v. Ware,
 
 509 So.2d 811, 813 (La. Ct.App. 1 Cir. 1987).
 

 [2]
 

 .On July 18, 1984, the defendant was convicted of armed robbery by a unanimous twelve-person jury for this offense. He was sentenced to ninety-nine years. The conviction and sentence were affirmed.
 
 State v. Sparks,
 
 483 So.2d 1246 (La. Ct.App. 4 Cir. 1986). Defendant had been previously convicted in the United States District Court for the Eastern District of Louisiana on January 4, 1971, for two counts of bank robbery and sentenced to 15 years concurrent on each count.
 

 [3]
 

 . Ms. Broadway also uses her maiden name, Hegwood.
 

 [4]
 

 . This restaurant was commonly known in the area as Hi Ho Sam’s. At the time of the murder, a new owner was operating it as Paul’s Drive In. The majority of testimony by all witnesses refers to the restaurant as Hi Ho Sam’s.
 

 [5]
 

 . Defendant’s previous motion to change venue from Tangipahoa Parish was granted on February 19, 1986 and the trial was moved to Livingston Parish.
 

 [6]
 

 . We discount Deputy Graves’s additional testimony that the day before a black male and a black female dressed in turbans and robes, accompanied with three small children, arrived at the prison. They delivered a white skull cap and robe to be given to the defendant. He testified this did not have anything to do with increasing security but confirmed the necessity for the extra security. He also acknowledged this was religious clothing.
 

 [7]
 

 . One venireperson, Mr. Leland Jones, was inconvenienced by the manhunt and was successfully challenged for cause by the defendant. Venireperson Ms. Tammy Carrier was apprehensive about being a juror because she heard "some followers or something might cause trouble” and she also heard that security was tight because there could be trouble during the proceedings.
 

 [8]
 

 . The actual tally of voir dire, from two separate lists in the record, shows that the defendant used 12 peremptory challenges. Moreover, the voir dire transcript of August 13, 1986, reflects that both the State and the defense had exhausted their peremptory challenges at the point where the first alternate juror was accepted.
 

 [9]
 

 . The Court found even if a State’s systematic striking of African-Americans “in the selection of petit juries raises a prima facie case under the Fourteenth Amendment, we think it is readily apparent that the record in this case is not sufficient to demonstrate that the rule has been violated by the peremptory system as it operates in Talladega County.”
 
 Swain,
 
 380 U.S. at 224, 85 S.Ct. at 838.
 

 [10]
 

 . Discussed
 
 infra.
 

 [11]
 

 . Justice Powell, delivering the opinion of the court, wrote: "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury ... raises the necessary inference of purposeful discrimination.”
 
 Batson,
 
 476 U.S. at 96, 106 S.Ct. at 1723. A reasonable reading of the reference to "these facts,” in the context of the entire paragraph, can only mean the first two facts to be established,
 
 Le.,
 
 (1) a cognizable group and (2) a peremptory challenge. After establishing these predicate facts, the defendant must show that these facts and any other relevant circumstances raise an inference of purposeful discrimination by the prosecutor, before the burden shifts to the prosecutor to articulate a neutral explanation.
 

 [12]
 

 . In order to qualify to serve as a juror, a person must be able to read, write, and speak the English language. La.Code Crim. Proc. art. 401(A)(3) (West 1986).
 

 [13]
 

 . The transcript notes the name is spelled phonetically.
 

 [14]
 

 . We note the brief also relies upon the dissenting opinion in
 
 Pruitt v. State:
 
 "When a prospective juror is struck based on information received from outside sources, the trial court has a duty to probe the reliability of this information.”
 
 Id.,
 
 986 So.2d at 951 (Diaz, J., dissenting).
 

 [15]
 

 . In
 
 Illinois v. Allen,
 
 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Court considered the question of whether the accused can be afforded his Sixth Amendment right to be present at his trial while at the same time he engages in disorderly and disruptive behavior. The Court held the Constitution sometimes permitted special measures to handle an obstreperous defendant, including binding and gagging, thereby keeping him present.
 
 Id.,
 
 at 343-344, 90 S.Ct. at 1061. But the Court immediately added that "even to contemplate such a technique, ... arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings_"
 
 Id.,
 
 at 344, 90 S.Ct. at 1061.
 

 [16]
 

 . In
 
 Holbrook v. Flynn,
 
 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the Court considered whether the conspicuous, or at least noticeable, deployment of uniformed officers in a courtroom during trial is the "sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial.”
 
 Id.,
 
 at 568-569, 106 S.Ct. at 1345-1346. The Court held the presence of security personnel was not inherently prejudicial because of the wider range of inferences a juror might reasonably draw from the officers’ presence, whereas "shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large.”
 
 Id.,
 
 at 569, 106 S.Ct. at 1346.
 

 [17]
 

 . In
 
 Chapman,
 
 the Court fashioned a harmless-constitutional-error rule, which requires that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.
 
 Id.,
 
 at 24, 87 S.Ct. at 828. Stated another way, the question is whether there is a reasonable possibility the evidence complained of might have contributed to the conviction.
 
 Id.
 

 [18]
 

 . However, in light of
 
 Deck v. Missouri,
 
 in the future where a district court places a defendant in physical restraints visible to the jury, the court should ensure the record contains a determination by the court that they are justified by a state interest specific to that particular trial.
 

 [19]
 

 . Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him. La. Code Crim. Proc. art. 201 (West 1986).
 

 [20]
 

 . The four-factor balancing test developed in
 
 Barker v. Wingo,
 
 407 U.S. 514, 530, 92 S.Ct. 2182, 2191-2192, 33 L.Ed.2d 101 (1972), takes into consideration (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant demanded a more rapid trial, and (4) the prejudice to the defendant as a result of the delay.